# 24-916(L)

## 24-1121(CON)

---

# In the United States Court of Appeals for the Second Circuit

---

IN RE: ACETAMINOPHEN – ASD-ADHD
PRODUCTS LIABILITY LITIGATION

---

On Appeal from the United States District Court
for the Southern District of New York
(Nos. 1:22-md-03043, 1:22-mc-3043) (Hon. Denise Cote)

---

**BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

JEFFREY R. WHITE
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amicus Curiae*

July 24, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae the American Association for Justice states it is a non-profit corporation. It has no parent company, and no publicly owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ........................................................ ii

**TABLE OF CONTENTS** ................................................................................ iii

**TABLE OF AUTHORITIES** .......................................................................... iv

**INTEREST OF AMICUS CURIAE** .................................................................. 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** .................................... 1

**I.   THE CONSTITUTIONAL RIGHT TO A JURY AS FINDER OF FACT IN CIVIL TRIALS IS FUNDAMENTAL AND MUST BE PRESERVED.** 4

A. Federal Rule of Evidence 702 Was Designed to Preserve the Constitutional Primacy of the Jury as Factfinder in the Adversary System. ........................... 9

B. *Daubert* Preserved the Constitutional Role of the Jury as Factfinder. ........ 12

**II.  AN AGGRESSIVE CAMPAIGN AGAINST THE CIVIL JURY HAS DIMINISHED THE VIGILANT PRESERVATION OF AMERICANS' SEVENTH AMENDMENT JURY RIGHT.** ................................................. 13

**III. DECISIONS THAT EXCLUDE EXPERT TESTIMONY IN VIOLATION OF THE SEVENTH AMENDMENT ARE REVERSIBLE FOR ABUSE OF DISCRETION** .................................................................. 22

A. American Juries Are as Capable as Judges to Assess the Weight and Credibility of Scientific and Technical Experts ................................................ 23

B. Closer Scrutiny of Incursion on the Factfinding Role of the Jury Will Foster Improvements to Aid Jurors in Understanding of Scientific Evidence. ........................................................................................ 25

**CONCLUSION** ........................................................................................... 27

**CERTIFICATE OF COMPLIANCE** ............................................................. 28

**CERTIFICATE OF SERVICE** ..................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................9

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ...................................11

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988)...............................11

*Cent. Ala. Elec. Co-op. v. Tapley*, 546 So. 2d 371 (Ala. 1989) ...............................21

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) ........4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).................... 12, 13, 14

*Dimick v. Schiedt*, 293 U.S. 474 (1935) ......................................5

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)...............................19

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).................................12

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)...........................................22

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ...............................8

*Haimes v. Temple Univ. Hosp.*, 39 Pa. D. & C.3d 381 (Pa. Com. Pl. 1986)...........20

*Huckle v. Money*, 2 Wils. 205, 95 Eng. Rep. 768 (C.P. 1763) ..................................6

*In re Acetaminophen – ASD-ADHD Prod. Liab. Litig.*, No. 22MC3043 (DLC), 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023)............................................ 4, 10, 14

*In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 239 (3d Cir. 1983) ..............12

*In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829 (3d Cir. 1990) ..............................12

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)..................................5

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)....................................22

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ............................................7, 8

*Parsons v. Bedford*, 28 U.S. (3 Pet.) 433 (1830) ...............................................7

*Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117 (2024) ...................................5, 6

*Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29 (1944) .....................................9

*Wilkes v. Wood*, Lofft 1, 98 Eng. Rep. 489 (K.B. 1763) ............................................6

**Other Authorities**

The Declaration of Independence (U.S. 1776) ..........................................................7

Act of Jan. 2, 1975, Pub. L. No. 93-595, 88 Stat. 1926 ...........................................10

Fed. R. Evid. 702 advisory committee's note to 2000 amendment .........................11

Fed. R. Evid. 702 advisory committee's note to 2023 amendment .........................10

*Admissibility of Scientific Evidence*, 107 Harv. L. Rev. 254 (1993) .......................13

Akhil Reed Amar, *Fourth Amendment First Principles*,
  107 Harv. L. Rev. 757 (1994) ...............................................................................6

Alan Herbert, *Tort Reform Drive Launched*, J. Com., Mar. 19, 1986 ....................16

Allan Kanner & M. Ryan Casey, Daubert *and the Disappearing Jury Trial*,
  69 U. Pitt. L. Rev. 281 (2007) ...............................................................................20

Am. Bar Assoc. Special Comm. on Jury Comprehension,
  Jury Comprehension in Complex Cases (1989) ...................................................24

Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion,"
  "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and
  Jury Trial Commitments?*, 78 N.Y.U. L. Rev. 982 (2003) ............................. 17, 18

Austin Scott, *Trial by Jury and the Reform of Civil Procedure*,
  31 Harv. L. Rev. 669 (1918) ..................................................................................6

Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639 (1973) ................................................................7

Consumers Union, *The Manufactured Crisis: Liability Insurance Companies Have Created a Crisis and Dumped It on You*, Consumer Reports, Aug. 1986 ...........16

David M. Flores et al., *Examining the Effects of the* Daubert *Trilogy on Expert Evidence Practices in Federal Civil Court: An Empirical Analysis*, 34 S. Ill. U. L.J. 533 (2010)................................................................21

Edith Guild Henderson*, The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289 (1966) ................................................................7

Eric Fleisig-Greene, *Why Contempt Is Different: Agency Costs and Petty Crime in Summary Contempt Proceedings*, 112 Yale L.J. 1223 (2003)................................8

Frederick Schauer & Barbara A. Spellman, *Is Expert Evidence Really Different?*, 89 Notre Dame L. Rev. 1 (2013) ................................................................24

Hans Zeisel, *The Debate over the Civil Jury in Historical Perspective*, 1990 U. Chi. Legal Forum 26................................................................25

Jack Weinstein & Margaret Berger, Weinstein's Evidence (1988)........................11

Jeff L. Lewin, *Calabresi's Revenge? Junk Science in the Work of Peter Huber*, 21 Hofstra L. Rev. 183 (1992)................................................................19

Jeffrey R. White, *The Civil Jury: 200 Years Under Siege*, Trial, June 2000 ............7

Joe S. Cecil et al., *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials*, 40 Am. U. L. Rev. 728 (1991)............... 23, 24, 26

John Guinther, The Jury in America (1988) ................................................................6

John T. Nockleby, *How to Manufacture a Crisis: Evaluating Empirical Claims Behind "Tort Reform,"* 86 Or. L. Rev. 533 (2007)................................18

John W. Wade, *An Evaluation of the "Insurance Crisis" and Existing Tort Law*, 24 Houston L. Rev. 81 (1987) ................................................................18

vi

Marc Galanter, *An Oil Strike in Hell: Contemporary Legends About the Civil Justice System*, 40 Ariz. L. Rev. 717 (1998) ............................................................. 18

Marc Galanter, *News from Nowhere: The Debased Debate on Civil Justice*, 71 Denv. U. L. Rev. 77 (1993) ........................................................................ 18

Marc Galanter, *Real World Torts: An Antidote to Anecdote*, 55 Md. L. Rev. 1093 (1996) ................................................................................ 18

Michael J. Saks, *Do We Really Know Anything About the Behavior of the Tort System—And Why Not?*, 104 U. Pa. L. Rev. 1147 (1992) ..................................... 19

Michael S. Jacobs, *Testing the Assumptions Underlying the Debate About Scientific Evidence: A Closer Look at Juror "Incompetence" and Scientific "Objectivity,"* 25 Conn. L. Rev. 1083 (1993) ....................................................................... 23

N.J. Schweitzer & Michael J. Saks, *Jurors and Scientific Causation: What Don't They Know, and What Can Be Done About It?*, 52 Jurimetrics J. 433 (2012) ..... 26

Neil Vidmar & Shari Seidman Diamond, *Juries and Expert Evidence*, 66 Brook. L. Rev. 1121 (2001) ........................................................................ 25

Neil Vidmar & Valerie P. Hans, American Juries: The Verdict (2007) ................... 25

Neil Vidmar, *Expert Evidence, the Adversary System, and the Jury*, 95 Am. J. Pub. Health S137 (2005) .................................................................. 24

Neil Vidmar, Medical Malpractice and the American Jury: Confronting the Myths About Jury Incompetence, Deep Pockets and Outrageous Damage Awards (1995) ....................................................................... 18

Patrick. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex. L. Rev. 47 (1977) ....................................... 8

Paul C. Giannelli, *Daubert*: Interpreting the Federal Rules of Evidence, 15 Cardozo L. Rev. 1999 (1994) .................................................................... 9

Peter W. Huber, Galileo's Revenge: Junk Science in the Courtroom (1991) ... 19, 20

Peter W. Huber, *Junk Science and the Jury*, 1990 U. Chi. Legal F. 273 (1990)......19

Peter W. Huber, *Junk Science in the Courtroom*, 26 Val. U. L. Rev. 723 (1992)....19

Philip H. Corboy, *The Not-So-Quiet Revolution: Rebuilding Barriers to Jury Trial in the Proposed Restatement (Third) of Torts: Products Liability*, 61 Tenn. L. Rev. 1043 (1994) ................................................................15

Ralph Nader, *The Assault on Injured Victims' Rights*, 64 Denver U. L. Rev. 625 (1988) ........................................................15

Ralph Nader, *The Corporate Drive to Restrict Their Victims' Rights*, 22 Gonz. L. Rev. 15 (1986) ................................................................16

Richard L. Jolly et al., *Democratic Renewal and the Civil Jury*, 57 Ga. L. Rev. 79 (2022) ....................................................... 20, 21, 26

Richard Wright, *Allocating Liability Among Multiple Responsible Causes: A Principled Defense of Joint and Several Liability for Actual Harm and Risk Exposure*, 21 U.C. Davis L. Rev. 1141 (1988) ......................................18

Robert Robinson, Daubert v. Merrell Dow *Pharmaceuticals and the Local Construction of Reliability*, 19 Alb. L.J. Sci. & Tech. 39 (2009)........................22

Robert S. Peck & Erwin Chemerinsky, *The Right to Trial by Jury as a Fundamental and Substantive Right and Other Civil-Trial Constitutional Protections*, 96 Or. L. Rev. 489 (2018) .................................................. 14, 20, 21

Shari Seidman Diamond et al., *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003)................................25

Sheldon Whitehouse, *Restoring the Civil Jury's Role in the Structure of Our Government*, 55 Wm. & Mary L. Rev. 1241 (2014)......................................15

Stanton D. Krauss, *The Original Understanding of the Seventh Amendment Right to Jury Trial*, 33 U. Rich. L. Rev. 407 (1999) ...............................................7

Stephan Landsman, *The Civil Jury in America: Scenes from an Unappreciated History*, 44 Hastings L.J. 579 (1993) .......................................6, 8

Stephen Daniels & Joanne Martin, Civil Juries and the Politics of Reform (1995) ................................................................................................... 16, 18

Stephen Daniels & Joanne Martin, *Myth and Reality in Punitive Damages*, 75 Minn. L. Rev. 1 (1990) ...................................................................17

Stephen Daniels & Joanne Martin, *Where Have All the Cases Gone? The Strange Success of Tort Reform Revisited*, 65 Emory L.J. 1445 (2016) .......21

Theodore Eisenberg & James A. Henderson, Jr., *The Quiet Revolution in Products Liability: An Empirical Study of Legal Change*, 37 UCLA L. Rev. 479 (1990)..16

Valerie P. Hans & Neil Vidmar, *The Verdict on Juries*, 91 Judicature 226 (2008)..24

Valerie P. Hans et al., *The Arizona Jury Reform Permitting Civil Jury Trial Discussions: The Views of Trial Participants, Judges, and Jurors*, 32 U. Mich. J.L. Reform 349 (1999)...................................................................26

William Blackstone, Commentaries...........................................................................5

## INTEREST OF AMICUS CURIAE[1]

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, securities matters, and other civil actions, including pharmaceutical products liability actions. Throughout its 77-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

## INTRODUCTION AND SUMMARY OF ARGUMENT

1. The district court's exclusion of Plaintiffs' expert testimony on general causation violated the underlying principle of Federal Rule of Evidence 702, that federal judges are not "armchair scientists." More fundamentally, the court below exceeded its proper role of looking at the reliability of the proffered experts' methodologies. The court took for itself the role of factfinder, assessing the weight and credibility of the experts' conclusions. That ruling violated Plaintiffs' Seventh

---

[1] All parties have consented to the filing of this brief. No party or party's counsel had any role in authoring this brief in part or in whole. No person or entity—other than amicus curiae and its counsel—contributed money that was intended to fund preparing or submitting this brief.

Amendment right to have the jury decide those matters and warrants reversal.

Because the right to trial by jury is fundamental and looms large in America's history, the Supreme Court has instructed that any seeming curtailment of that right be closely scrutinized. The American colonists treasured trial by jury as a privilege of English subjects, and when the Crown denied them that right, they declared their independence. The Founding generation insisted that the new nation's Constitution contain an express guarantee of the right to have a jury serve as finder of fact in civil cases.

Importantly, the Founders intended this Seventh Amendment guarantee to serve as a check on the power of unelected and life-tenured federal judges. The Supreme Court has repeatedly emphasized that it is the jury's function, not the judge's, to select among competing inferences and conclusions presented to them.

Federal Rule of Evidence 702 was designed to preserve this role of the jury by expanding the admissibility of expert opinion where relevant and helpful to the jury. The Supreme Court's gloss on Rule 702 in *Daubert*, likewise expressed a vote of confidence in the capability of American juries, aided by traditional tools of the adversary system—cross-examination, opposing evidence, and proper instructions—to properly assess the testimony of experts.

2.     Judicial usurpation of the proper role of the jury, as in this case, has become a more common occurrence as a result of an aggressive campaign to devalue and

discredit the notion that ordinary Americans should hold powerful corporations accountable. In the mid-1980's, the liability insurance industry undertook a well-funded effort to promote "tort reform" using false and misleading stories of outrageous verdicts. The major corporations behind the campaign portrayed Americans who served on juries as gullible and easily swayed by experts using "junk science." A consequence has been an erosion of the vigilant preservation of the jury right mandated by the Seventh Amendment.

3.    Appellate tribunals should emphasize that expert opinions based on reliable principles and methodology are admissible. The reliability of their conclusions can be insured by vigorous cross-examination, presentation of counter evidence, and proper jury instructions. Exclusion based on the district court's view that the experts' conclusions lack sufficient weight or credibility, as in this case, invades the province of the jury and should be reversed for abuse of discretion.

Empirical research confirms that Americans who serve as jurors are fully capable of properly evaluating and making factual determinations based upon expert testimony. Multiple studies have demonstrated that juries assess expert opinion involving scientifically complex subjects as well as judges. Closer appellate scrutiny that favors presenting relevant expert testimony to the jury will foster greater efforts to implement changes that will improve juror performance.

3

## I. THE CONSTITUTIONAL RIGHT TO A JURY AS FINDER OF FACT IN CIVIL TRIALS IS FUNDAMENTAL AND MUST BE PRESERVED.

AAJ agrees with Plaintiffs that the district court abused its discretion in excluding Plaintiffs' expert testimony on general causation, *In re Acetaminophen – ASD-ADHD Prod. Liab. Litig.*, No. 22MC3043 (DLC), 2023 WL 8711617, at *36 (S.D.N.Y. Dec. 18, 2023), and violated the underlying principle of Federal Rule of Evidence 702 that district courts may not appoint themselves "armchair scientists empowered to adjudicate scientific debates." Appellants' Br.– 1. Rule 702 authorizes the trial judge to examine an expert's methodology and principles, but not to determine whether the expert's conclusions may be believed. *Id.* at 3.

AAJ addresses this Court to emphasize the more fundamental principle at stake in this case. The district court took upon itself the jury's role as factfinder, ultimately deciding the entire case against Plaintiffs. That ruling violated Plaintiffs' Seventh Amendment rights and warrants reversal.[2]

As Justice Kennedy wrote for the Supreme Court, "In actions at law, issues that are proper for the jury must be submitted to it 'to preserve the right to a jury's resolution of the ultimate dispute,' as guaranteed by the Seventh Amendment." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 718 (1999)

---

[2]  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend VII.

(quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996)). The importance of trial by jury as a fundamental right must not be undervalued if it is to be "preserved," as commanded by the Founders. Sadly, in recent times, the civil jury has been devalued—even disparaged—by those who seek immunity from accountability at the hands of ordinary Americans fulfilling their duty under the Constitution and serving as jurors. Indeed, the court below, in its wholesale termination of Plaintiffs' right to present their case to a jury, made no mention of the Seventh Amendment.

That fundamental right looms large in America's history and governance. Indeed, the Supreme Court very recently reaffirmed that "[t]he right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)).

Americans historically have viewed trial by jury as a feature of democratic self–government, from their colonial experience, through a bloody Revolution, to the forging of the Constitution itself. *Id.* at 2128. The colonists took to heart Blackstone's praise for the jury trial as "the most transcendent privilege" of English subjects, 3 William Blackstone, Commentaries *379, and they complained bitterly

5

when the Crown "began evading American juries by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts." *Jarkesy*, 114 S. Ct. at 2128.

The American colonists saw kindred spirits in the heroic English jurors who resisted oppression by the Crown and, in particular, by the Crown's judges. *See* John Guinther, The Jury in America 24–36 (1988) (describing the duress visited by the trial judge upon the jurors in the trial of William Penn). They closely followed the civil suit by John Wilkes and his printer for damages against officials who conducted an illegal search in their effort to suppress Wilkes' criticism of the government. *Wilkes v. Wood*, Lofft 1, 98 Eng. Rep. 489 (K.B. 1763), and *Huckle v. Money*, 2 Wils. 205, 95 Eng. Rep. 768 (C.P. 1763). Wilkes' case was "a matter of keen interest in the American colonies." *See* Stephan Landsman, *The Civil Jury in America: Scenes from an Unappreciated History*, 44 Hastings L.J. 579, 591 (1993)*,* and "was probably the most famous case in late eighteenth-century America." Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 772 (1994). On the eve of the American Revolution, "Treatises extolling the jury flooded the market and profoundly influenced eighteenth century American as well as English views about jury trial." Landsman, *supra*, at 591 (citing Austin Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv. L. Rev. 669, 676 (1918)).

It is difficult to overstate the role that the civil jury played in the run-up to the American Revolutionary War and the founding of the United States. The colonists'

6

right to present their cases to juries of their neighbors became bound up with controversies over taxation and self-government. Jeffrey R. White, *The Civil Jury: 200 Years Under Siege*, Trial, June 2000, at 20. Ultimately, they complained, the King's "depriving us in many cases, of the benefits of Trial by Jury" warranted their separation from England. The Declaration of Independence para. 20 (U.S. 1776). Trial by jury was the only right universally secured by all thirteen original American state constitutions. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 341 (1979) (Rehnquist, J., dissenting).

The new Americans were surprised, then, when the delegates to the Constitutional Convention finished their work and rode away from Philadelphia without including an express guarantee of the right to trial by jury in civil cases. White, *supra*, at 22. That omission very nearly doomed ratification of the entire constitution. Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289, 295–98 (1966); Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 672 n.89 (1973). As Justice Story recounts, it was only after the Federalists agreed to adopt a Bill of Rights that included a guarantee of jury trials in civil cases, that the Constitution won ratification. *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 445 (1830). *See* Stanton D. Krauss, *The Original Understanding of the Seventh Amendment Right to Jury Trial*, 33 U. Rich. L. Rev. 407, 411–13 (1999).

Importantly, the Seventh Amendment was intended specifically to check "the otherwise autocratic power and authority of the judge." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 83 (1989) (White, J., dissenting). The jury right was "too precious to be left to the whim of the sovereign, or, it might be added, *to that of the judiciary*." *Parklane*, 439 U.S. at 343 (Rehnquist, C.J., dissenting) (emphasis added). As Judge Patrick Higginbotham has observed, "American federal courts . . . have a peculiar need for the democratizing influence of the jury" because an independent judiciary, essential to judicial review, also carries "its attendant risk of autocratic behavior." Patrick. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex. L. Rev. 47, 52 (1977).

The Seventh Amendment reflected the former colonists' bitter experience with Crown-appointed judges. The Anti-Federalists "refused to accept an unconstrained federal judiciary in which judges were free to act like England's" judges, controlling juries and serving only the interests of the elites. Landsman, *supra*, at 600. *See also* Eric Fleisig-Greene, *Why Contempt Is Different: Agency Costs and Petty Crime in Summary Contempt Proceedings*, 112 Yale L.J. 1223, 1229 (2003) (explaining that the Founders included the right to a jury trial, at least in part, because of "the functional role of the jury as a way to assure that the judiciary remained accountable to, and aligned with, the interests of the citizenry it purported to serve").

To avoid encroachment on this right, the Supreme Court has repeatedly held

that the weight and credibility of witness testimony belongs to the trier of fact; it is their fundamental role. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of inferences from the facts are jury functions, not those of a judge.").

> It is the jury, not the court, which is the factfinding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions and draws the ultimate conclusion as to the facts. . . Its function is *to select among conflicting inferences and conclusions that which it considers most reasonable*. That conclusion, whether it relates to negligence, causation, or any other factual matter cannot be ignored.

*Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944) (emphasis added).

## A. Federal Rule of Evidence 702 Was Designed to Preserve the Constitutional Primacy of the Jury as Factfinder in the Adversary System.

In 1975, Congress enacted Federal Rule of Evidence 702 to govern the admissibility of expert testimony in federal courts, adopted the view of courts and scholars who had urged broad admissibility of testimony by qualified experts if relevant and helpful to the jury, to be tested using the tools of the adversary system. *See* Paul C. Giannelli, *Daubert*: *Interpreting the Federal Rules of Evidence*, 15 Cardozo L. Rev. 1999, 2009–12 (1994) (summarizing the competition between the "relevancy" approach, which relied on the common sense of jurors, aided by the adversary system, and the "reliability" approach, which relied upon trial judges to recognize and exclude unreliable expert evidence).

As initially enacted, Rule 702 simply stated:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Act of Jan. 2, 1975, Pub. L. No. 93-595, 88 Stat. 1926 (establishing rules of evidence for certain courts and proceedings).[3]

The purpose, as the Advisory Committee on Evidence Rules ("Advisory Committee") subsequently made clear, was to expand the admissibility of expert testimony by eliminating the judicial barriers and trusting the jury, aided by vigorous cross-examination, to assess its weight and credibility. *See* Fed. R. Evid. 702

---

[3] As the court below noted, recent amendments to Rule 702 became effective December 1, 2023. *In re Acetaminophen*, 2023 WL 8711617, at *16 n.27. Rule 702(d) now provides that the proponent must establish that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." However, as the district court also pointed out, the Advisory Committee stated that "Nothing in the amendment imposes any new, specific procedures." *Id.* (quoting Fed. R. Evid. 702 advisory committee's notes to 2023 amendment).

The Advisory Committee cautioned:

> [N]othing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection. On the other hand, it does not permit the expert to make claims that are unsupported by the expert's basis and methodology.

Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Nor, in AAJ's view, does the Rule authorize the court to comb the expert's testimony for internal contradictions, omissions, or misinterpretations that are more properly exposed for the jury by the adversary process for their determination.

advisory committee's note to 2000 amendment. The rationale was succinctly explained by the leading treatise on the rules: "We ought not assume the jurors are less intelligent or alert than lawyers or judges. And we ought not inhibit experts from giving us as much aid as they can." Jack Weinstein & Margaret Berger, Weinstein's Evidence 703–29 (1988).

The Supreme Court took note of Congress's "general approach of relaxing the traditional barriers to 'opinion' testimony," *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988). In the Court's view, Rule 702 stood as a clear vote of confidence in the ability of the jury, assisted by the adversary trial process. The evidence rules "anticipate that relevant, unprivileged evidence should be admitted, and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party" and that juries, aided by the adversary system, will be "competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 898–99 (1983). As to the objection that "a jury will not be able to separate the wheat from the chaff," the Court responded, "We do not share in this low evaluation of the adversary process." *Id.* at 899.

The federal courts echoed the Supreme Court's confidence in the jury, specifically with respect to the weight to accord an expert's conclusions arrived at by applying an accepted methodology to the facts of the case. As the Third Circuit pointed out:

[T]he suggestion that the court must, in deciding on admissibility, carefully scrutinize the underlying assumptions, the inferences drawn, and the conclusions reached, if followed rigorously, would result in the trial court, as distinguished from the fact-finder, deciding the weight to be given to the testimony.

*In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 239, 279 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). *See also In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 858 (3d Cir. 1990) (stating that if the challenged expert testimony "is more accurately described as an application of an accepted methodology, it is not the proper subject of a Rule 702-based exclusion, but rather the subject of cross-examination of the expert and resolution by the jury").

**B.    *Daubert* Preserved the Constitutional Role of the Jury as Factfinder.**

The Supreme Court gave its own gloss on Rule 702 in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The D.C. Circuit had held in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), that a novel scientific principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs" to warrant admission of expert testimony based upon it. *Id.* at 1014. The question in *Daubert* was whether this "dominant standard for determining the admissibility of novel scientific evidence at trial," survived the enactment of Rule 702. *Daubert*, 509 U.S. at 585. The Court firmly announced that it had not.

The Justice Blackmun, writing for the Court, explained that the restrictive

"general acceptance" test was "at odds" with the "liberal thrust" of the Federal Rules of Evidence. *Id.* at 588. Rather, expert testimony is properly admitted under Rule 702 if it "will assist the trier of fact" and is capable of being tested. *Id.* at 593. The Court emphasized that this inquiry is a "flexible one." *Id.* at 593–94, and its "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 599.

Like Rule 702 itself, the Court's decision in *Daubert* was a clear vote of confidence in the jury and the adversary system. The Court rejected the notion that removal of rigid judicial control would "result in a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions." *Id.* at 595.

> [R]espondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence

*Id.* at 596. The bench and bar rightly viewed *Daubert* as cementing the broader admissibility of expert opinion under Rule 702. *E.g.*, *Admissibility of Scientific Evidence*, 107 Harv. L. Rev. 254, 260 (1993).

## II. AN AGGRESSIVE CAMPAIGN AGAINST THE CIVIL JURY HAS DIMINISHED THE VIGILANT PRESERVATION OF AMERICANS' SEVENTH AMENDMENT JURY RIGHT.

As Plaintiffs correctly argue, the district court's exclusion of the testimony of

their experts was based on the trial court's determination that the experts' conclusions were entitled to little weight or credibility. The district court barred the jury from hearing testimony by Plaintiffs' experts regarding whether prenatal exposure to acetaminophen can cause ASC and/or ADHD in children. The district court determined that the experts' opinions were unreliable because it believed they were guilty of cherry-picking of favorable results, ignoring of confounding factors (such as genetics), and ignoring or devaluing other studies that arrived at different results. *In re Acetaminophen*, 2023 WL 8711617, at *18–22. These are precisely the kinds of shortcomings that should more appropriately be addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

The district court's decision to take the factfinding job away from the jury was an abuse of discretion because it trampled Plaintiffs' Seventh Amendment right to have the jury determine the facts of their case. Unhappily, such decisions have become more common. Robert S. Peck & Erwin Chemerinsky, *The Right to Trial by Jury as a Fundamental and Substantive Right and Other Civil-Trial Constitutional Protections*, 96 Or. L. Rev. 489, 507–09 (2018). What might account for such judicial failures to uphold the primacy of the jury as originally intended by the Seventh Amendment?

One very obvious culprit is the relentless, decades-long, anti-jury campaign

14

waged by those who most fear the power of ordinary Americans to hold powerful economic interests accountable for the harms they cause in pursuit of profits. Senator Sheldon Whitehouse has reminded us that "in the last forty years . . . the civil justice system as a whole, and the civil jury particularly, have been the targets of a sustained attack by corporations." Sheldon Whitehouse, *Restoring the Civil Jury's Role in the Structure of Our Government*, 55 Wm. & Mary L. Rev. 1241, 1254–55 (2014). This well-funded legal campaign was designed "to make the civil justice system more favorable to corporations." *Id.* at 1256.

In the mid-1980's, the liability insurance industry underwent one of its cyclical contractions in capacity, and drastically raised premiums. *See* Philip H. Corboy, *The Not-So-Quiet Revolution: Rebuilding Barriers to Jury Trial in the Proposed Restatement (Third) of Torts: Products Liability*, 61 Tenn. L. Rev. 1043, 1062–65 (1994). And along with the price increase came the loud laying of blame— not on the industry's own irresponsibly risky cash-flow underwriting, or on their insureds' own unsafe conduct. The industry's accusing fingers were pointed at the victims of defective products, medical malpractice, unsafe premises, and other avoidable dangers. Ralph Nader, *The Assault on Injured Victims' Rights*, 64 Denver U. L. Rev. 625, 627–29 (1988).

The insurers enlisted the aid of their policy holders to mount "massive publicity campaigns as well as enormously expensive federal and state legislative

lobbying efforts." Theodore Eisenberg & James A. Henderson, Jr., *The Quiet Revolution in Products Liability: An Empirical Study of Legal Change*, 37 UCLA L. Rev. 479, 483 (1990). The Insurance Information Institute, the industry's public relations arm, announced that its nationwide campaign would "change the widely held perception of an insurance crisis to a perception of a lawsuit crisis." Alan Herbert, *Tort Reform Drive Launched*, J. Com., Mar. 19, 1986, at 1, 20. *See also* Consumers Union, *The Manufactured Crisis: Liability Insurance Companies Have Created a Crisis and Dumped It on You*, *Consumer Reports*, Aug. 1986, at 544.

This campaign would turn out to be, in the words of Ralph Nader, "one of the most unprincipled public relations scams in the history of American industry." Ralph Nader, *The Corporate Drive to Restrict Their Victims' Rights*, 22 Gonz. L. Rev. 15, 18 (1986).

The corporate strategy was to convince Americans that their civil justice system was broken and in need of "tort reform" to limit frivolous lawsuits and outrageous jury verdicts. The campaign saturated media outlets with dubious statistics and with anecdotes of shocking verdicts supposedly handed down by "runaway" juries. *See* Stephen Daniels & Joanne Martin, Civil Juries and the Politics of Reform 1–59 (1995) (describing the political clout, resources, and propaganda directed at the public and policymakers to create a false impression about runaway juries and a system gone awry); Eisenberg & Henderson, Jr., *supra*, at 733 (noting

the "questionable, if not false, premises" of the campaign); Stephen Daniels & Joanne Martin, *Myth and Reality in Punitive Damages*, 75 Minn. L. Rev. 1, 9–14 (1990) (describing "slice-of-death" advertising and other public relations techniques employed by the tort reform campaign).

In the tort reformers' telling, Americans who enter the courtroom to serve as jurors suddenly become unintelligent and gullible, rendering verdicts based entirely on sympathy and easily swayed by plaintiffs' experts. News and entertainment outlets were happy to repeat versions of real cases where plaintiffs and the juries who rewarded them were "made to appear silly" Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. Rev. 982, 988 (2003). One very successful such anecdote was the widely, but misleadingly publicized "McDonald's Coffee Case."[4]

This effort to manufacture public support legislation that would limit their own legal recourse for wrongful injury was truly an exercise in "public relations, propaganda, and the mobilization of prejudice and fear," Daniels & Martin, *supra*, at 13; an example of "raw interest group politics" employing "smokescreens and false alarms," Richard Wright, *Allocating Liability Among Multiple Responsible*

---

[4]   The true story is told using case documents in Michael McCann et. al., *Java Jive: Genealogy of A Juridical Icon*, 56 U. Miami L. Rev. 113, 121 (2001). *See also* Liane E. Leshne, *Shedding New Light*, Trial, Oct. 1998, at 32, 34.

*Causes: A Principled Defense of Joint and Several Liability for Actual Harm and Risk Exposure*, 21 U.C. Davis L. Rev. 1141, 1148, 1164 (1988); as well as outright "intentional misrepresentation," John W. Wade, *An Evaluation of the "Insurance Crisis" and Existing Tort Law*, 24 Houston L. Rev. 81, 96 (1987).

A comprehensive debunking of many of the campaign's tall tales is set out in Marc Galanter, *An Oil Strike in Hell: Contemporary Legends About the Civil Justice System*, 40 Ariz. L. Rev. 717 (1998). *See also* Stephen Daniels & Joanne Martin, Civil Juries and the Politics of Reform (1995); Neil Vidmar, Medical Malpractice and the American Jury: Confronting the Myths About Jury Incompetence, Deep Pockets and Outrageous Damage Awards (1995); Marc Galanter, *Real World Torts: An Antidote to Anecdote*, 55 Md. L. Rev. 1093 (1996); and Marc Galanter, *News from Nowhere: The Debased Debate on Civil Justice*, 71 Denv. U. L. Rev. 77 (1993). The tort reformers' claim that out-of-control juries were generating a "litigation crisis" also were also shown to be a statistical sham. *See* John T. Nockleby, *How to Manufacture a Crisis: Evaluating Empirical Claims Behind "Tort Reform,"* 86 Or. L. Rev. 533 (2007); Miller, *supra*, at 995 (empirical evidence disproved that notion of "runaway" jury verdicts, which actually remained "strikingly stable" over a twenty-five-year period); Michael J. Saks, *Do We Really Know Anything About the*

*Behavior of the Tort System—And Why Not?*, 104 U. Pa. L. Rev. 1147 (1992).[5]

One important feature of the tort reform campaign was that Plaintiffs' "paid-for experts" were filling courtrooms with "junk science" that average jurors are simply not equipped to evaluate. Perhaps the most highly visible critics in this vein was the Manhattan Institute's Peter Huber. *See* Peter W. Huber, Galileo's Revenge: Junk Science in the Courtroom (1991); Peter W. Huber, *Junk Science in the Courtroom*, 26 Val. U. L. Rev. 723 (1992). Huber called upon judges to "reduce the amount of science that juries must decide for themselves" because gullible juries too often accept the "junk science" claims presented of plaintiffs' expert witnesses that "mainstream scientists categorically reject." Peter W. Huber, *Junk Science and the Jury*, 1990 U. Chi. Legal F. 273, 278, 302 (1990).[6]

One story told by Huber and widely repeated in popular media claimed that a Philadelphia psychic, supported by a medical expert, won a million-dollar medical malpractice verdict because a CAT scan robbed her of her psychic powers. Huber,

---

[5] The Supreme Court itself, years later, confessed to have been misled by the campaign's claims of "runaway" punitive damage verdicts. The Court recognized that "the most recent studies tend to undercut much of [the criticism of punitive damages]. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497 (2008). Instead, research "reveals that discretion to award punitive damages has not mass-produced runaway awards." *Id.* Rather the data indicates "an overall restraint" on the part of juries. *Id.* at 498–99.

[6] On Huber's own deficiencies, see Jeff L. Lewin, *Calabresi's Revenge? Junk Science in the Work of Peter Huber*, 21 Hofstra L. Rev. 183 (1992) (book review).

Galileo's Revenge, *supra*, at 3–4. The story was largely fabricated.[7]

Following *Daubert*, opponents of the jury seized on the Court's "gatekeeper" language as a license to call upon courts to clamp down on expert testimony supporting plaintiffs. The corporate public-relations machine once again moved into high gear, transforming *Daubert* into a great victory in the battle against "junk science." Richard L. Jolly et al., *Democratic Renewal and the Civil Jury*, 57 Ga. L. Rev. 79, 135–36 (2022). Conferences, articles, and continuing legal education programs emphasized the judges' gatekeeper role in keeping expert evidence from coming before a jury, resulting in a dramatic increase in pretrial attacks on plaintiffs' experts. Peck & Chemerinsky, *supra*, at 508–09; Allan Kanner & M. Ryan Casey, Daubert *and the Disappearing Jury Trial*, 69 U. Pitt. L. Rev. 281, 296–97 (2007).

In spite of the efforts by serious researchers to debunk the fake tales and false claims, the aggressive public relations campaign to devalue Americans who serve

---

[7]  In fact, the jury found only that the dye injected as part of the CAT scan caused plaintiff to suffer "nausea, vomiting, shortness of breath, constricture of the throat and hives." These were the only adverse effects addressed by plaintiff's medical expert. The jury was expressly instructed not to consider whether the dye caused plaintiff to suffer severe headaches, as she alleged, or whether it affected her psychic powers, which was not supported by her expert. *Haimes v. Temple Univ. Hosp.*, 39 Pa. D. & C.3d 381, 390 (Pa. Com. Pl. 1986), *aff'd*, 576 A.2d 1141 (Pa. Super. 1990). The common pleas court took note of the fact that the case had achieved "monumental notoriety," as lobbying groups and others had "perverted the facts of this case and the basis of the jury verdict and used it as an example of one of the causes of the alleged insurance crisis." *Id.* at 383.

on juries had a substantial impact. Although it was initially viewed as confirming the jury's fact-finding prerogatives, *Daubert* became a restrictive bar to jury consideration of scientific evidence. Peck & Chemerinsky, *supra*, at 498–99. Challenges to proffered expert testimony increased substantially. David M. Flores et al., *Examining the Effects of the* Daubert *Trilogy on Expert Evidence Practices in Federal Civil Court: An Empirical Analysis*, 34 S. Ill. U. L.J. 533, 563 (2010). Two scholars from the American Bar Foundation concluded that tort reform succeeded in diminishing the number of cases filed. *See* Stephen Daniels & Joanne Martin, *Where Have All the Cases Gone? The Strange Success of Tort Reform Revisited*, 65 Emory L.J. 1445, 1490 (2016).

Most concerning for the defenders of the Seventh Amendment right, the civil jury has become regularly relegated in popular and constitutional discussions to little more than an optional dispute resolution tool, with some disparaging it as a poor one at that. Jolly et al., *supra*, at 82. As the Alabama Supreme Court had occasion to lament, "we are faced almost daily with" criticism of "the helplessness and lack of sophistication of jurors obligated to resolve issues in complex litigation." *Cent. Ala. Elec. Co-op. v. Tapley*, 546 So. 2d 371, 376 (Ala. 1989).

Revitalization of this fundamental constitutional right requires vigilance on the part of appellate tribunals in cases such as this.

21

## III. DECISIONS THAT EXCLUDE EXPERT TESTIMONY IN VIOLATION OF THE SEVENTH AMENDMENT ARE REVERSIBLE FOR ABUSE OF DISCRETION

This Court reviews decisions by the district court to admit or exclude expert testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). This standard is deferential, but must not be toothless. The high affirmance rate under this deferential standard gives trial judges, who are themselves not scientific experts, autonomy in determining what expert evidence will go to the jury. Robert Robinson, Daubert v. Merrell Dow *Pharmaceuticals and the Local Construction of Reliability*, 19 Alb. L.J. Sci. & Tech. 39, 63 (2009) (noting an affirmance rate of *Daubert* decisions of about 90%). In some cases, such as this one, this evidentiary ruling has the practical effect of deciding the case. As one court memorably stated, "elevating judges to the role of St. Peter at the gates of heaven" would "inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995).

If this Court is to preserve the constitutional right to trial by jury in cases that involve scientific evidence, the solution cannot be for district courts to take over more and more of the factfinding role that the Seventh Amendment reserves to the jury alone. The answer must be for appellate tribunals to give clear direction to district courts to scrupulously respect the jury's role in determining which expert opinions are to be according weight and credibility. American juries are fully capable

of shouldering this constitutional responsibility.

**A.    American Juries Are as Capable as Judges to Assess the Weight and Credibility of Scientific and Technical Experts.**

One happy consequence of the tort reformers' focus on the supposed inability of jurors to critically and accurately evaluate expert opinion has been to focus a great deal of scholarly attention on the subject.

Over the last quarter century, a substantial body of empirical research has confirmed that jurors are not as gullible or as easily confused by expert testimony as the anti-jury advocates have argued. These studies "strongly rebut[] the broad assumption that jurors are not competent to understand complicated scientific evidence." Michael S. Jacobs, *Testing the Assumptions Underlying the Debate About Scientific Evidence: A Closer Look at Juror "Incompetence" and Scientific "Objectivity*," 25 Conn. L. Rev. 1083, 1090, 1094–98 (1993).

Summarizing five recent social science research projects concerning "jury competence in ordinary trials," Joe S. Cecil, Project Director in the Division of Research at the Federal Judicial Center, and Valerie P. Hans, Professor of Criminal Justice and Psychology at the University of Delaware, concluded that "doubts about jury competence expressed by jury critics stand in sharp contrast to the judgments of scholars who conduct research on jury decisionmaking." Joe S. Cecil et al., *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials*, 40 Am. U. L. Rev. 728, 744–45 (1991). To the contrary, "empirical evidence consistently

23

points to the general competence of the jury." *Id.* at 745. Indeed, the Federal Judicial Center's examination of juror performance in a substantial number of demanding civil trials, concluded that "the overall picture of the jury that emerges from available data indicates that juries are capable of deciding even very complex cases." *Id.* at 764.

Similarly, an American Bar Association study found that juries in complex cases were not unduly influenced by expert testimony. *See* Am. Bar Assoc. Special Comm. on Jury Comprehension, Jury Comprehension in Complex Cases 40 (1989).

A subsequent survey concluded that "[c]laims about jury incompetence, irresponsibility, and bias in responding to expert evidence [are] not consistent with a review of the many studies that have examined these issues from various methodological perspectives." Neil Vidmar, *Expert Evidence, the Adversary System, and the Jury*, 95 Am. J. Pub. Health S137, S137–42 (2005). More recent studies as well give jurors high marks in critical evaluation of expert opinion. *See* Valerie P. Hans & Neil Vidmar, *The Verdict on Juries*, 91 Judicature 226, 227 (2008) ("Jurors critically evaluate the content and consistency of testimony provided by both lay and expert witnesses, and do not appear to rubber stamp expert conclusions."); Frederick Schauer & Barbara A. Spellman, *Is Expert Evidence Really Different?*, 89 Notre Dame L. Rev. 1, 14 (2013) ("[A] substantial body of research, mostly produced by

24

psychologists, casts doubt on the empirical foundations of the longstanding belief in jury overvaluation of expert testimony.").

Multiple studies also indicate that lay jurors perform as well as judges in their assessments of expert testimony, agreeing with judges' liability views liability "in about four out of five cases." Neil Vidmar & Valerie P. Hans, American Juries: The Verdict 148–52 (2007). *See also* Neil Vidmar & Shari Seidman Diamond, *Juries and Expert Evidence*, 66 Brook. L. Rev. 1121, 1176–77 (2001) (stating that multiple studies demonstrate "high levels of agreement between judge and jury, even when the judge rated the trial evidence as difficult"); Shari Seidman Diamond et al., *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1, 67 n.108 (2003) (finding a 77% agreement rate between judges and juries on the evaluation of expert testimony).

### B. Closer Scrutiny of Incursion on the Factfinding Role of the Jury Will Foster Improvements to Aid Jurors in Understanding of Scientific Evidence.

As a pioneer scholar of the American jury has stated, "In spite of all the efforts to diminish its role or to do away with it entirely, the jury has remained a robust institution. Hans Zeisel, *The Debate over the Civil Jury in Historical Perspective*, 1990 U. Chi. Legal Forum 26, 31. "Once we realize that the civil jury is here to stay, all of our criticism should be directed towards helping the jury to do an even better job." *Id.* at 30.

Closer scrutiny of decisions to exclude expert testimony will prompt greater reliance on the civil jury factfinding role as well as on the traditional tools the adversary system provides to aid the jury in fulfilling its responsibility.

In addition, as scholars have long pointed out, "A wide variety of available techniques ease the burdens of laypersons when considering evidence. By greater use of such devices, increasingly sophisticated adjudication and regulation can remain responsive to the values and concerns of the citizenry." Cecil et al., *supra*, at 774. *See, e.g.*, Valerie P. Hans et al., *The Arizona Jury Reform Permitting Civil Jury Trial Discussions: The Views of Trial Participants, Judges, and Jurors*, 32 U. Mich. J.L. Reform 349, 375 (1999) (preliminary views of changes designed to aid in juror understanding); N.J. Schweitzer & Michael J. Saks, *Jurors and Scientific Causation: What Don't They Know, and What Can Be Done About It?*, 52 Jurimetrics J. 433, 447–52 (2012) (noting the effectiveness of juror training presentations in assisting jurors in understanding scientific evidence); Jolly et al., *supra*, at 158–61 (proposing a variety of procedural changes in the ways jurors receive scientific evidence to foster more active involvement of jurors, which have been shown to improve the fairness and accuracy of jury fact-finding).

The constitutional right to trial by jury can be preserved, as the Seventh Amendment commands, by allowing and assisting jurors to fulfill their role.

## CONCLUSION

For these reasons, the judgment of the district court should be reversed.

Respectfully submitted,

*/s/ Jeffrey R. White*

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amicus Curiae*
*American Association for Justice*

July 24, 2024

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and Local Rules 29.1 and 32.1(4), I certify that the foregoing brief is proportionately spaced using 14–point Times New Roman font and contains 6,523 words, excluding the parts exempted from length limits by Federal Rule 32(f).

Dated: July 24, 2024

*/s/ Jeffrey R. White*
Jeffrey R. White

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2024, I electronically filed the foregoing amicus brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 24, 2024

*/s/ Jeffrey R. White*
Jeffrey R. White

*Counsel for Amicus Curiae*