# 24-916(L)

## 24-1121(CON), 24-2360(CON)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

TIFFANY RUTLEDGE, INDIVIDUALLY AND AS MOTHER, GENERAL GUARDIAN OF, ET AL., KRISTOPHER WHITE, BRIDGET MCCONNELL, ALEXANDER HOLLAND, CHRISTINE HOLLAND,

*Plaintiffs-Appellants,*

—against—

WALGREEN CO., COSTCO WHOLESALE CORPORATION, CVS HEALTH CORPORATION, CVS PHARMACY, INC., SAFEWAY, INC., WALMART INC., A DELAWARE CORPORATION, RITE AID CORPORATION, TARGET CORPORATION, SAM'S WEST, INC., DOLLAR TREE, INC., 7-ELEVEN, INC., FAMILY DOLLAR STORES, LLC, THE KROGER CO., DOLLAR TREE STORES, INC., JOHNSON & JOHNSON CONSUMER INC., BIG LOTS, GIANT FOOD, LLC, ALBERTSON'S, HARRIS TEETER LLC, DOLGENCORP, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR DEFENDANTS-APPELLEES

Jeffrey S. Bucholtz
Amy R. Upshaw
KING & SPALDING LLP
1700 Pennsylvania Ave NW, Ste. 900
Washington, DC 20006
(202) 737-0500

Jay P. Lefkowitz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4970

*Additional Counsel on Inside Cover*

Matthew Noller
KING & SPALDING LLP
50 California St, Suite 3300
San Francisco, CA 94111
(415) 318-1200

*Attorneys for Defendants-Appellees*
*Walmart Inc. and Sam's West, Inc.*

Kristen L. Richer
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3896

*Attorney for Defendants-Appellees*
*CVS Pharmacy, Inc., Walgreen Co.,*
*and Costco Wholesale Corporation*

Amanda Groves
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
(213) 615-1700

*Attorney for Defendants-Appellees*
*Safeway, Inc., and Albertsons*
*Companies, Inc.*

Joseph A. Lara
STONE | DEAN LLP
21052 Oxnard Street
Woodland Hills, CA 91367
(818) 595-7735

*Attorney for Defendant-Appellee The*
*Kroger Company*

Cole T. Carter
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951

*Attorneys for Defendant-Appellee*
*Johnson & Johnson Consumer Inc.*

Lori B. Leskin
Mitchell Russell Stern
ARNOLD & PORTER KAYE
SCHOLER LLP
250 W. 55th Street
New York, NY 10019
(212) 836-8000

William C. Perdue
Anthony J. Franze
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Defendants-Appellees*
*7-Eleven, Inc., Dollar Tree Stores, Inc.,*
*and Family Dollar Stores, LLC*

Anne A. Gruner
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1165

*Attorney for Defendant-Appellee*
*Dolgencorp, LLC*

Deanne E. Maynard
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740

Julie Y. Park
Alexandra Preece Barlow
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA, 92130
(858) 720-5100

Alexandra M. Avvocato
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
(212) 336-8638

*Attorneys for Defendant-Appellee*
*Target Corporation*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Johnson & Johnson Consumer, Inc. ("JJCI") has been renamed Kenvue Brands LLC as of October 28, 2024. Kenvue Brands is a wholly owned subsidiary of Kenvue Inc., a publicly held corporation. No other publicly held corporation owns 10% or more of the stock of Kenvue Brands.

Defendant-Appellee Walmart. Inc. has no parent corporation. Walmart Inc. is a publicly traded company. No publicly traded company owns 10% or more of its stock.

Defendant-Appellee Sam's West Inc. is a wholly owned subsidiary of Walmart Inc. No other public corporation owns 10% or more of the stock of Sam's West Inc.

Defendant-Appellee 7-Eleven, Inc. is a wholly owned subsidiary of SEJ Asset Management & Investment Company, Inc. No publicly held corporation owns 10% or more of 7-Eleven, Inc.'s stock. SEJ Asset Management & Investment Company, Inc. is owned in part by Seven & i Holdings, Co., Ltd., whose stock is publicly traded on the Tokyo Stock Exchange, and in part by Seven-Eleven Japan Co., Ltd., which is itself a wholly owned subsidiary of Seven & i Holdings, Co., Ltd.

Defendant-Appellee Dollar Tree Stores, Inc. is a wholly owned subsidiary of Dollar Tree, Inc., whose stock is publicly traded on the NASDAQ Stock Market.

Defendant-Appellee Family Dollar Stores, LLC is a wholly owned subsidiary

of Defendant-Appellee Dollar Tree Stores, Inc. No publicly held corporation owns 10% or more of Family Dollar Stores, LLC's stock. Defendant-Appellee Dollar Tree Stores, Inc. is a wholly owned subsidiary of Dollar Tree, Inc., whose stock is publicly traded on the NASDAQ Stock Market.

Defendant-Appellee CVS Pharmacy, Inc. (separately and incorrectly identified as CVS Health Corporation), is owned by CVS Health Corporation, a publicly traded company. No entity owns more than 10% of CVS Health Corporation's stock.

Defendant-Appellee Walgreen Co. is owned by Walgreens Boots Alliance, Inc., a publicly traded company. No entity owns more than 10% of Walgreens Boots Alliance, Inc.'s stock.

Defendant-Appellee Costco Wholesale Corporation has no parent company and no entity owns more than 10% of Costco Wholesale Corporation's stock.

Defendant-Appellee Target Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Defendant-Appellee Dolgencorp, LLC is a private limited liability company whose sole member is Dollar General Corporation. Dollar General Corporation is a publicly traded company that owns 10% or more of Dolgencorp, LLC's membership interest.

Defendant-Appellee Safeway, Inc. is a wholly owned subsidiary of

Defendant-Appellee Albertsons Companies, Inc. ("Albertsons"). Albertsons is a publicly traded corporation on the New York Stock Exchange under the ticker symbol ACI. Albertsons has no parent corporation and as of the date of this filing and to the best of its knowledge, no publicly traded company owns at least 10% of the stock of Albertsons.

Defendant-Appellee The Kroger Company has no parent corporation. Kroger is a publicly traded company. No publicly traded company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES .................................................................vi

PRELIMINARY STATEMENT ..............................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ...........................5

STATEMENT OF THE CASE ...............................................................5

    I.     Factual Background .................................................................5

          A.    Acetaminophen and Its Use During Pregnancy ..........................5

          B.    Autism Spectrum Disorder (ASD) ...............................................7

          C.    Attention-Deficit/Hyperactivity Disorder (ADHD) .................8

          D.    Studies of Prenatal Acetaminophen Exposure and ASD, ADHD, and Other Adverse Neurodevelopmental Outcomes .................................................................10

          E.    Statements of Regulatory Agencies and Medical Organizations .................................................................13

    II.    Procedural History .................................................................16

          A.    The District Court Denies Motions to Dismiss Plaintiffs' Claims on Preemption Grounds .................................................16

          B.    The District Court Excludes the Opinions of Plaintiffs' General-Causation Experts .................................................17

SUMMARY OF ARGUMENT ...............................................................23

STANDARD OF REVIEW .................................................................25

ARGUMENT .................................................................26

    I.     The District Court Did Not Abuse Its Discretion in Holding Plaintiffs' Experts' Transdiagnostic Approach to ASD and

ADHD Was Unreliable. .......................................................26

II.    The District Court Did Not Abuse Its Discretion in Finding That, Even If Plaintiffs' Transdiagnostic Approach to ASD and ADHD Were Reliable, Plaintiffs' Experts' Opinions Still Should Be Excluded. ..........................................................................32

       A.    The District Court Properly Excluded Dr. Baccarelli...............35

       B.    The District Court Properly Excluded Dr. Cabrera. .................45

       C.    The District Court Properly Excluded Dr. Pearson. .................49

       D.    The District Court Properly Excluded Dr. Louie.....................50

III.   In the Alternative, Plaintiffs' Claims Are Preempted by Federal Law. ..............................................................................51

CONCLUSION ................................................................59

CERTIFICATE OF COMPLIANCE.......................................62

CERTIFICATE OF SERVICE ...............................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ..................................................25, 26, 34

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................52

*Daniels-Feasel v. Forest Pharms., Inc.*,
    2023 WL 4837521 (2d Cir. July 28, 2023)........................4, 32, 34, 41

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................3, 24, 33, 52

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)..................................................................57

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 1336 (1997)................................................................38

*Kisor v. Wilkie*,
    588 U.S. 558 (2019)..............................................................53, 57

*In re Lipitor (Atorvastin Calcium) Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    892 F.3d 624 (4th Cir. 2018) ................................................4, 20, 33

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002)..........................................45

*Marentette v. Abbott Labs., Inc.*,
    886 F.3d 112 (2d Cir. 2018) ...................................................52, 56

*Merck Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019)..............................................................52

*Milward v. Acuity Specialty Prods. Grp.*,
    639 F.3d 11 (1st Cir. 2011).......................................................47

*In re Mirena IUS Levonogorstrel-Related Prods. Liab. Litig.*,
    982 F.3d 113 (2d Cir. 2020) ..........................................................*passim*

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018) ..........................................*passim*

*N.Y. SMSA Ltd. P'ship v. Town of Clarkston*,
    612 F.3d 97 (2d Cir. 2010) ........................................................26

*Nat. Res. Def. Council v. FDA*,
    710 F.3d 71 (2d Cir. 2013) ..........................................................6

*New York v. FERC*,
    535 U.S. 1 (2002)........................................................................52

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin)
    Prods. Liab. Litig.*,
    93 F.4th 339 (6th Cir. 2024) ......................................................33

*United States v. Gomez*,
    877 F.3d 76 (2d Cir. 2017) ..........................................................40

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..............................................................58, 59

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) ............................................19, 45, 46

## Statutes & Regulations

28 U.S.C. § 517 ..............................................................................17

21 C.F.R. § 201.63 ..........................................................................53

21 C.F.R. § 201.63(a)..................................................................7, 54

21 C.F.R. § 201.63(b) ............................................................7, 55, 56

21 C.F.R. § 330.1(c)(2)...................................................................54

## Rules

Fed. R. Evid. 702 .......................................................................*passim*

**Other Authorities**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision, 2022)....................................7, 8, 10

Congressional Research Service, *FDA Regulation of Over-the-Counter (OTC) Drugs: Overview and Issues for Congress* (Dec. 10, 2021) ...............................................................................................6

FDA, *FDA Recommends Avoiding Use of NSAIDs in Pregnancy at 20 Weeks or Later Because They Can Result in Low Amniotic Fluid* (Oct. 15, 2020), https://www.fda.gov/media/142967/download .........................6

*Limitations of Labeling Terminology*, 47 Fed. Reg. 29,002 (July 2, 1982) .................................................................................................54

*Pregnant or Nursing Women; Delegations of Authority and Organization; Amendment of Labeling Requirements for Over-the-Counter Human Drugs*, 47 Fed. Reg. 54,750 (Dec. 3, 1982).....................*passim*

## PRELIMINARY STATEMENT

This appeal concerns acetaminophen, also known as APAP, the active ingredient in Tylenol® and many other over-the-counter pain relievers and fever reducers. Plaintiffs allege that *in utero* exposure to acetaminophen can cause autism spectrum disorder ("ASD") and attention-deficit/hyperactivity disorder ("ADHD") in the children of women who use acetaminophen products while pregnant. But regulatory agencies and medical organizations have reviewed the evidence on which Plaintiffs and their experts rely and determined that it does ***not*** support a causal relationship between prenatal acetaminophen exposure and ASD or ADHD. The FDA, after conducting six literature reviews in less than ten years, has consistently concluded that "the limitations and inconsistent findings of current observational studies" are "unable to support a determination of causality." The American College of Obstetricians and Gynecologists found "no clear evidence that proves a direct relationship" between acetaminophen use and any neurodevelopmental issues. And the Society of Obstetricians and Gynaecologists of Canada determined that the "evidence of causality" is "weak and has many fundamental flaws."

Plaintiffs' general-causation experts sought to buck the professional consensus, but could do so only by employing unreliable, results-driven methodologies. First, to compensate for the grievous lack of causation evidence for ASD claims—neither of the two studies on the topic even found an independent

1

*association* between prenatal acetaminophen exposure and ASD—Plaintiffs' experts employed a "transdiagnostic" approach so they could lump together studies regarding ASD, ADHD, and other developmental outcomes. The experts then opined that acetaminophen can cause neurodevelopmental disorders *generally*, rather than rendering discrete opinions for both ASD and ADHD. The district court rightly rejected this methodology, which conflates two conditions with distinct diagnostic criteria. Plaintiffs offer no substantive defense of their experts' failure to distinguish between ASD and ADHD, and instead invoke examples of scientists applying a transdiagnostic approach to other conditions and take brief remarks in a single study out of context. Those inapposite arguments would not warrant reversal under *de novo* review, much less the "highly deferential abuse of discretion standard" that applies to a district court's decision to exclude expert testimony. *In re Mirena IUS Levonogorstrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 122 (2d Cir. 2020) ("*Mirena II*").

Second, even after conflating two distinct conditions and a host of neurodevelopmental outcomes, Plaintiffs' experts could find support for their opinions only by cherry-picking favorable results, ignoring qualifications and limitations given by study authors, and dismissing more probative contrary findings without adequate explanation. That sort of outcome-driven reasoning is inherently unreliable and necessitated the exclusion of Plaintiffs' experts' opinions, regardless

2

of whether one accepts their transdiagnostic approach.

Plaintiffs' brief does not even acknowledge the district court's repeated observations that their experts' opinions were plagued by cherry-picking and outcome-driven reasoning. Instead, Plaintiffs attack the district court for "picking sides" in a scientific debate. Appellants' Br. ("Br."), Dkt.120, at 25. In Plaintiffs' view, the court should have simply determined whether their experts' opinions "align[ed] with analysis performed by peers in the relevant literature" and, if so, deemed the opinion admissible. Br.28. In other words, if an expert can cite mere sentences or incomplete data from peer-reviewed literature that appear to support his opinion, then, according to Plaintiffs, the expert's opinion is necessarily reliable.

Plaintiffs' argument would transform the trial court's role under Rule 702 from that of a gatekeeper, who must take a "hard look" at the expert's opinion to ensure the reliability of his methodology, to that of a box-checker, who merely confirms the expert purports to apply a reliable methodology and has cited some arguably supportive scientific studies. *Mirena II*, 982 F.3d at 123. If the bare fact that a general-causation expert could cite a peer-reviewed study in support of his position were enough to satisfy *Daubert*, a court could *never* exclude an expert for cherry-picking favorable evidence—contrary to decisions from this Court and other courts of appeals. The question for a trial court is not whether the expert has identified some pieces of evidence that, when viewed in isolation, support his

3

conclusion. Rather, the question is whether the expert has applied a valid methodology, in a principled manner, to all of the relevant facts and data. When an expert engages in "[r]esult-driven analysis, or cherry picking," the answer is no, because such an approach "undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor (Atorvastin Calcium) Mktg., Sales Pracs., & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018); *see also Daniels-Feasel v. Forest Pharms., Inc.*, 2023 WL 4837521 (2d Cir. July 28, 2023) (summary order). The district court did not abuse its discretion when it concluded that Plaintiffs' experts employed exactly that kind of unreliable analysis here.

There is, moreover, an independent ground for affirming the judgment for Defendants: Plaintiffs' claims are preempted because an FDA regulation (the "Pregnancy Warning Regulation" or "Regulation") prohibits Defendants from adding the warning that Plaintiffs claim state law requires. The Pregnancy Warning Regulation requires over-the-counter drugs to bear a general warning advising pregnant women to consult with their doctors and provides that, if (and only if) FDA has approved a warning regarding a pregnancy-related risk for a specific over-the-counter drug, that specific warning must *replace* the general warning. Yet the district court concluded that manufacturers can add an *unapproved* warning to *supplement* the general warning whenever state law so requires. That is contrary to

4

the text, structure, and history of the Regulation and FDA's stated policy of requiring "a single national pregnancy-nursing warning" to "ensure that consumers receive clear, unambiguous, and consistent information on the labeling of OTC drugs." *Pregnant or Nursing Women; Delegations of Authority and Organization; Amendment of Labeling Requirements for Over-the-Counter Human Drugs*, 47 Fed. Reg. 54,750, 54,756 (Dec. 3, 1982).

This Court should affirm.

## COUNTER-STATEMENT OF ISSUES PRESENTED

1.      Whether the district court abused its discretion and committed manifest error when it excluded as unreliable the opinions of experts who: (a) opined that the products in question could cause ASD, ADHD, or both, without conducting separate analyses of those two distinct conditions; and (b) cherry-picked favorable evidence and otherwise employed results-driven analyses to reach their conclusions.

2.      Whether the Pregnancy Warning Regulation preempts any state-law requirement that a manufacturer supplement the federally mandated general pregnancy warning by adding a warning regarding a specific pregnancy-related risk that is *not* approved by FDA.

## STATEMENT OF THE CASE

### I.      Factual Background

### A.      Acetaminophen and Its Use During Pregnancy

Acetaminophen has been considered a safe and effective treatment for pain

5

and fever for over half a century. FDA advises women that acetaminophen is generally safe to use throughout pregnancy, unlike ibuprofen, aspirin, and other common pain and fever treatments, which may cause "rare but serious kidney problems" in infants when used after 20 weeks of pregnancy.[1] Approximately 60% of American women use acetaminophen while pregnant. SPA-11.

The acetaminophen products at issue in this litigation, like most over-the-counter ("OTC") drugs, are covered by a monograph—"a detailed regulation" issued by FDA that specifies, among other things, what information must appear on the labels of products that fall into a particular "therapeutic class of OTC drugs." *Nat. Res. Def. Council v. FDA*, 710 F.3d 71, 75 (2d Cir. 2013).[2] Through the monograph system, a drug can "bypass [the] individualized review" of the "New Drug Application" process and be deemed "generally recognized as safe and effective," and therefore eligible for sale in the United States, as long as the drug complies with the monograph's requirements. Acetaminophen belongs to a therapeutic class of

---

[1] *See* FDA, *FDA Recommends Avoiding Use of NSAIDs in Pregnancy at 20 Weeks or Later Because They Can Result in Low Amniotic Fluid* (Oct. 15, 2020), https://www.fda.gov/media/142967/download.

[2] *See* Congressional Research Service, *FDA Regulation of Over-the-Counter (OTC) Drugs: Overview and Issues for Congress* (Dec. 10, 2021), at 1 ("Although prescription drugs are marketed pursuant to FDA approval via a new drug application (NDA) or an abbreviated new drug application (ANDA), most OTC drug products are marketed under a different mechanism, by complying with an OTC monograph.").

pain-, fever-, and inflammation-relieving drugs governed by a monograph. *See* Over-the-Counter (OTC) Monograph M013: Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use (Oct. 14, 2022).

FDA's Pregnancy Warning Regulation requires the labels for all OTC medications "intended for systemic absorption," including acetaminophen, to state, with the first four words in bold, "**If pregnant or breast-feeding**, ask a health professional before use." 21 C.F.R. § 201.63(a). In promulgating that requirement, FDA explained that "a woman would be best advised on whether to use a particular OTC drug by a knowledgeable health professional who is either familiar with her medical history or readily available to her and capable of assessing her situation with respect to a particular drug." *Pregnant or Nursing Women*, 47 Fed. Reg. at 54,751. The Regulation also provides that, if a more specific warning regarding pregnancy- or nursing-related risks "has been established" by FDA "in a new drug application (NDA) or … an OTC drug final monograph," then "the specific warning shall be used in place of" the general warning, unless FDA requires otherwise. 21 C.F.R. § 201.63(b). Here, the monograph for acetaminophen's therapeutic class includes specific pregnancy and nursing warnings for aspirin, but *not* for acetaminophen.

## B. Autism Spectrum Disorder (ASD)

ASD, or autism, is a complex neurodevelopmental disorder that involves significant difficulties with social communication. According to the *Diagnostic and*

*Statistical Manual of Mental Disorders* ("DSM"), a clinical diagnosis of ASD requires a finding that a child has "[p]ersistent deficits" in (1) social-emotional reciprocity; (2) nonverbal communicative behaviors; and (3) developing, maintaining, and understanding relationships. A diagnosis also requires the presence of at least two of the following four behaviors: (1) stereotyped or repetitive movements; (2) inflexible adherence to routine or ritualized patterns of behavior; (3) highly restricted interests of abnormal intensity or focus; and (4) hyper- or hypo-reactivity to sensory input.[3]

The reported frequency of ASD in the United States ranges from 1% to 2% of the population.[4] Like many neurodevelopmental disorders, ASD is highly heritable—a measure of how much of a trait's variation in the population is due to genetic factors. The DSM reports that a recent five-country study estimated ASD's heritability at 80%.[5]

### C. Attention-Deficit/Hyperactivity Disorder (ADHD)

ADHD is a neurodevelopmental disorder characterized by a "persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with

---

[3] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision, 2022), at 56-57.

[4] *Id*. at 62.

[5] *Id*. at 64.

functioning or development."[6] A clinical diagnosis of ADHD requires documentation of at least six symptoms of inattention or six symptoms of hyperactivity-impulsivity that persist for a minimum of six months.[7]

ADHD and ASD can appear in the same child, but the diagnostic criteria are distinct, and the DSM instructs clinicians to differentiate between the two disorders. As the DSM explains, "[t]he social dysfunction and peer rejection seen in individuals with ADHD must be distinguished from the social disengagement, isolation, and indifference to facial and tonal communication cues seen in individuals with [ASD].[8] Additionally, "[t]he increased motoric activity that may occur in ADHD must be distinguished from the repetitive motor behavior" observed in "some cases of [ASD]."[9] And while "[c]hildren with [ASD] may display tantrums because of an inability to tolerate a change from their expected course of events," children with ADHD "may misbehave or have a tantrum during a major transition because of impulsivity or poor self-control."[10]

ADHD is much more common than ASD. Population surveys indicate that

---

[6] *Id*. at 68.

[7] *Id*. at 68-69.

[8] *Id*. at 74.

[9] *Id*. at 73.

[10] *Id*. at 74.

ADHD occurs in approximately 7.2% of children.[11]  ADHD, like ASD, is strongly influenced by genetics, with heritability estimated at 74%.[12]  Although there is no single gene for ADHD, studies have identified a number of genetic variants that are associated with the disorder.[13]

### D.  Studies of Prenatal Acetaminophen Exposure and ASD, ADHD, and Other Adverse Neurodevelopmental Outcomes

Scientists have investigated the relationship between acetaminophen use during pregnancy and various developmental outcomes for years, and with increasing intensity over the last decade.  Many of the studies produced by these scientists have not evaluated diagnosed cases of ASD or ADHD, and have instead used questionnaires completed by parents, teachers, or clinicians to assess a broader range of behaviors and symptoms.  SPA-34-35.

At the time of the district court's decision, only two original studies had been conducted on the relationship between prenatal acetaminophen exposure and diagnosed cases of ASD.[14]  One of the studies, Liew 2016a, analyzed a cohort of

---

[11] *Id.* at 71.

[12] *Id.*

[13] *Id.*

[14] Two other studies examined the association between ASD diagnoses and acetaminophen use postpartum (Ji 2020) or shortly before delivery (Ji 2018).  SPA-27; *see* A-4520, A-1333.  A third study (Hornig 2018) analyzed the association between maternal fever and ASD, and found that acetaminophen was actually

10

more than 64,000 children and measured acetaminophen exposure according to maternal self-report during pregnancy. A-1367. The study found a statistically significant association for ASD diagnoses co-occurring with hyperkinetic disorder (HKD)—the analog for ADHD in the World Health Organization's equivalent of the DSM—but not an independent association for ASD without HKD. SPA-26. The other study, Saunders 2019, found no association between prenatal acetaminophen exposure and ASD diagnoses. *Id*.; *see* A-1451.

Studies of five different cohorts of children had examined the relationship between acetaminophen and ADHD when the district court ruled. Several observed a small, positive association between prenatal acetaminophen exposure and ADHD. One of those studies, Ystrom 2017, also found an association between ADHD and the *father's* acetaminophen use before pregnancy, suggesting that any relationship between exposure to acetaminophen *in utero* and ADHD is not causal and that some confounding factor, such as genetics, is driving the association. SPA-99; *see* A-1539. A DNA study of thousands of mothers in the U.K., Leppert 2019, lent credence to this theory when it found that mothers with high genetic risk for having children with ADHD were also more likely to use acetaminophen during late pregnancy. SPA-33-34; *see* A-1357.

---

*protective* against ASD. SPA-32-33; *see* A-1312.

When the district court issued its decision, only one study of prenatal acetaminophen exposure and ADHD diagnoses, Gustavson 2021, had sought to control for familial confounding, including genetic confounding, by using a "sibling-control" design. A sibling-control study compares the rates of ADHD in children exposed to acetaminophen *in utero* with the rates of ADHD in their unexposed siblings. If acetaminophen exposure were driving the association, rather than a confounding factor like genetics that affects siblings equally, one would expect the rates of ADHD in the exposed and unexposed siblings to be markedly different. But although Gustavson 2021 found an unadjusted association between ADHD and use of acetaminophen for more than 29 days during pregnancy, the association became insignificant after factoring in the sibling control. SPA-32; *see* A-4539.

Another sibling-control study, which examined both ASD and ADHD, was released after the district court's decision. That study, Ahlqvist 2024, replicated Gustavson's findings. Ahlqvist 2024 studied a massive dataset—all children born in Sweden for nearly fifteen years—and confirmed acetaminophen use through prenatal medical records. The study found modest associations between acetaminophen use and ASD and ADHD, but both associations disappeared after applying the sibling control.[15]

---

[15] The district court addressed Ahlqvist 2024 in a subsequent opinion excluding another expert put forward by a separate group of plaintiffs. *See* MDL.Dkt.1494.

12

### E.   Statements of Regulatory Agencies and Medical Organizations

FDA has been reviewing the scientific literature on prenatal acetaminophen exposure since 2014 and has repeatedly concluded there is *not* support for the claim that acetaminophen causes any adverse neurodevelopmental outcomes, much less ASD or ADHD specifically.

FDA opened a "Tracked Safety Issue" on prenatal acetaminophen exposure in 2014 and recommended that "no regulatory action be taken at this time" but that the agency "stay current on the published safety literature." SPA-38. In 2015, FDA issued a public Drug Safety Communication about prenatal use of several pain medicines, including acetaminophen. FDA considered studies regarding the association between acetaminophen use and ADHD but found the studies "had a number of methodologic limitations that make the findings difficult to interpret."[16] FDA concluded that "the weight of evidence is inconclusive regarding a possible connection between acetaminophen use in pregnancy and ADHD in children." SPA-39. When FDA reviewed the epidemiological literature again in 2017, it adhered to its position that the available studies "had significant limitations that question the causal effect of [acetaminophen] on adverse neurodevelopmental outcomes." SPA-39-40.

---

[16] Available at perma.cc/4JY6-CN6V.

13

Professional medical organizations concurred in FDA's judgment. The Society for Maternal–Fetal Medicine reviewed the scientific literature in 2017 and determined "the weight of the evidence is inconclusive regarding the possible causal relationship between acetaminophen use and neurobehavioral outcomes." SPA-41. And the U.K.'s Royal College of Obstetricians and Gynaecologists advised in 2018 that acetaminophen "remains safe for use during pregnancy and breastfeeding." *Id*.

In 2021, however, a group of scientists, clinicians, and epidemiologists generated public concern about prenatal acetaminophen exposure when they published a self-styled "Consensus Statement" and "call for precautionary action" in an academic journal. A-4689. The statement acknowledged that the studies of acetaminophen use and neurodevelopmental outcomes "were limited by potential confounding," including "by genetic factors," *id*., but nonetheless asserted that "the combined weight of animal and human scientific evidence [wa]s strong enough" to advise women to limit their use of acetaminophen during pregnancy. SPA-42.

The so-called Consensus Statement elicited a "Consensus Counterstatement" from another group of scientists and clinicians. A-1186. The Counterstatement concluded—as the Consensus Statement had admitted—that the available studies were "limited by serious methodological problems, including failure to account for confounding." SPA-43. The Counterstatement therefore "urge[d] against recommending" limitation of acetaminophen use during pregnancy "based on

14

inconclusive and insufficient evidence." *Id.* The authors of the Consensus Statement replied to make clear that they had "avoided any inference of causality in [the] Consensus Statement" and that their recommendations were precautionary. *Id.*; *see* A-1213.

Professional medical organizations also rejected the claims of the Consensus Statement. The American College of Obstetricians and Gynecologists reviewed the scientific literature and found "no clear evidence that proves a direct relationship between the prudent use of acetaminophen during any trimester and fetal developmental issues." SPA-44-45. And the Society of Obstetricians and Gynaecologists of Canada stated its position that "the evidence for causality for this claim is weak and has many fundamental flaws." SPA-45-46.

After the release of the Consensus Statement, FDA conducted another review of the scientific literature in 2022, which included 24 new studies since the 2017 review. FDA found that "there are still study limitations and inconsistent study findings that prohibit causal interpretations of the association between APAP exposure and functional neurobehavioral outcomes." SPA-40. The 2022 review also observed that "[u]ntreated fevers during pregnancy are associated with poor pregnancy outcomes," raising concerns about discouraging pregnant women from using the only fever reliever approved for use during pregnancy. MDL.Dkt.427-7 at 33. FDA's most recent review, in 2023, again found that "the limitations and

15

inconsistent findings" of the literature are "unable to support a determination of causality." SPA-40.

## II.   Procedural History

In 2022, several months after the publication of the Consensus Statement, plaintiffs began filing suit in federal court against the makers and retailers of acetaminophen products, alleging that plaintiffs or their children had developed ASD and/or ADHD due to prenatal acetaminophen exposure. On October 5, 2022, the Judicial Panel on Multidistrict Litigation consolidated the cases in this MDL.

### A.   The District Court Denies Motions to Dismiss Plaintiffs' Claims on Preemption Grounds

Before the formation of the MDL, Walmart moved to dismiss two of the cases brought against it on the ground that the Pregnancy Warning Regulation preempted the plaintiffs' claims. The district court denied the motions, holding that the Regulation "does not address the ability of manufacturers to supplement the general warning with safety warnings specific to their OTC drug," and then denied a motion for reconsideration. MDL.Dkt.145 at 22-23; MDL.Dkt.601. Johnson & Johnson Consumer Inc. ("JJCI") also filed a motion to dismiss on preemption grounds, and other retailer defendants incorporated JJCI's argument into their own motion. The court denied JJCI's motion as well. MDL.Dkt.589.

The day before it denied JJCI's motion to dismiss, the court issued an invitation to the United States, "including the Food and Drug Administration," to

16

provide its views on whether Plaintiffs' proposed warning, or any other warning regarding the risks of ASD or ADHD, should be added to acetaminophen labels. MDL.Dkt.588 at 3 (citing 28 U.S.C. § 517). In denying the motion to dismiss, the court noted that "[i]f the United States chooses to respond to this invitation and to declare that the Plaintiffs' proposed label change would result in a misbranding of acetaminophen," then it would revisit the preemption issue. MDL.Dkt.589 at 35. The court notified the parties of its intent to solicit the views of the United States in advance and permitted them to propose edits to the invitation. MDL.Dkt.561. Plaintiffs never objected to seeking the government's views. FDA ultimately declined to submit a statement of interest but submitted a copy of its most recent review of the epidemiological literature. MDL.Dkt.1105.

## B. The District Court Excludes the Opinions of Plaintiffs' General-Causation Experts

Plaintiffs put forward five experts with opinions relevant to the general-causation issue. Only two—Dr. Baccarelli and Dr. Cabrera—offered timely general-causation opinions that prenatal acetaminophen exposure can cause ASD and ADHD in humans.[17] A third expert, Dr. Hollander, sought to support Dr. Baccarelli and Dr.

---

[17] Dr. Hollander gave a general-causation opinion in his rebuttal report, but the district court correctly noted that "[a] rebuttal report is not the proper avenue to introduce entirely new analyses or opinions." SPA-125. Plaintiffs' brief does not take issue with the court's exclusion of that opinion.

17

Cabrera's transdiagnostic approach by opining that "it is appropriate to review the body of evidence that measures symptoms of neurodevelopmental disorders and to not limit the analysis to studies that focus on ASD and ADHD." SPA-124. A fourth expert, Dr. Pearson, opined that "preclinical"—*i.e.*, non-human—studies conducted on animals and cells show prenatal acetaminophen exposure potentially can cause ASD and ADHD. SPA-137. Finally, Dr. Louie provided a "dose/duration" opinion claiming that the use of acetaminophen for 28 days or more at any point during pregnancy—even after substantial neurological development has already occurred—doubles a child's risk of developing ASD or ADHD. SPA-141.

Defendants moved to exclude Plaintiffs' experts under Rule 702. The district court heard oral argument upon the completion of briefing and, on December 18, 2023, excluded all five experts' opinions. The court observed early in its opinion that the experts did not "render discrete opinions" regarding "the risk of ASD and the risk of ADHD" and instead "applied a 'transdiagnostic' analysis that sweeps into their analyses (and conclusions) ASD, ADHD, and other neurodevelopmental disorders." SPA-48. Because Plaintiffs failed to show that their transdiagnostic approach to ASD and ADHD was "generally accepted by the scientific community," and the court found that the approach "obscured instead of informing the inquiry on causation," the experts' causation opinions were unreliable and subject to exclusion. SPA-48-49.

18

*Dr. Baccarelli*.  Dr. Baccarelli applied two methods—a Bradford Hill analysis and a Navigation Guide analysis—to support his general-causation opinion.  A-1743-2016.  The Bradford Hill framework consists of nine criteria that epidemiologists use "to distinguish a causal connection from a mere association."  SPA-55 (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)).  For his Bradford Hill analysis, Dr. Baccarelli employed a transdiagnostic approach.  The district court rejected Dr. Baccarelli's argument that a combined Bradford Hill analysis was appropriate because the symptoms of ASD and ADHD "transcend diagnostic boundaries" and because both conditions are classified as neurodevelopmental disorders.  SPA-65.  "[T]he diagnostic criteria" for ASD and ADHD, the court observed, "are undeniably distinct."  *Id*.  Dr. Baccarelli also invoked Dr. Hollander's opinion as support for applying the transdiagnostic approach, but, as explained below, the court found Dr. Hollander's opinion unreliable as well.  Thus, "[w]hile a transdiagnostic Bradford Hill analysis may be appropriate if the basis for doing so is properly supported," the court found "that basis has not been supplied here."  SPA-69.

The court went on to rule that, even if Dr. Baccarelli's transdiagnostic approach were adequately supported, his Bradford Hill analysis was still unreliable.  SPA-70.  The court found that Dr. Baccarelli's analyses of "consistency" and "strength of association"—two of the three criteria on which he placed "great

19

weight"—were "particularly" unreliable due to his cherry-picking of favorable evidence and failure to engage with contrary findings. SPA-89, -94. The court also held that Dr. Baccarelli's Bradford Hill analysis should be excluded for the independent reason that he "fail[ed] to assess with sufficient rigor the relevant evidence of confounding by genetics." *Id*. In sum, Dr. Baccarelli's Bradford Hill analysis "d[id] not reflect a reliable application of scientific methods," SPA-100, because "each of [his] departures from settled and rigorous methodology favors the same outcome," which "suggests motivated, result-driven reasoning." *Id*. (quoting *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 251 (S.D.N.Y. 2018) ("*Mirena II*"), *aff'd*, 982 F.3d 113 (2d Cir. 2020)).

The court found that the absence of a reliable Bradford Hill analysis was fatal to Dr. Baccarelli's causation opinion because "[t]he Navigation Guide" framework that he employed in the alternative "is not designed to distinguish a causal connection from a mere association." SPA-68. But "[e]ven assuming the Navigation Guide's utility in assessing causation," the court concluded that Dr. Baccarelli's opinion was unreliable because it relied on the same "result-driven analysis" that plagued his Bradford Hill opinion. SPA-102, -104 (quoting *Lipitor*, 892 F.3d at 634).

***Dr. Cabrera***. Dr. Cabrera offered general-causation and biological-mechanism opinions. A-2204-2466. As a threshold matter, the district court found

20

that Dr. Cabrera's Bradford Hill analysis was fatally flawed because he "d[id] not explain the weight that he attache[d] to any of the Bradford Hill criteria or address the relationship among them," which "effectively disables a finder of fact from critically evaluating his work." SPA-109-110 (quoting *Mirena II*, 341 F. Supp. 3d at 248). Dr. Cabrera's causation analysis, which took up only a few pages of his report, also failed because it relied on the transdiagnostic approach and because its consideration of the Bradford Hill criteria was "cursory and unreliable." SPA-110. The court also excluded Dr. Cabrera's opinion regarding a potential biological mechanism of causation, finding that his analysis relied on "cherry picking isolated findings, ignoring inconsistent findings, and disregarding limitations expressed by a study's authors as well as generally accepted statistical principles." SPA-121.

**Dr. Hollander**. The district court noted that Plaintiffs "rely on Dr. Hollander to give his imprimatur to the transdiagnostic Bradford Hill analysis of causation applied by their other experts," but determined that "[h]is reports do not do so." SPA-127; *see* A-2467-A-2725. Rather than explaining "how to structure a reliable transdiagnostic Bradford Hill analysis, either generally or specifically to assess whether *in utero* exposure to acetaminophen causes ASD and/or ADHD," Dr. Hollander rendered an opinion "on a far more abstract plane." SPA-128. Dr. Hollander opined "that there may be overlap in the underlying biology of some of the symptoms of the [two] disorders" and that "traditional diagnostic categories" do

21

not always reflect the symptoms seen in individual patients, but neither of those observations sufficed to justify a shared causation analysis for ASD and ADHD. SPA-129 (emphasis omitted). Dr. Hollander's opinion was thus "largely irrelevant" and "too undeveloped to be otherwise admissible." SPA-133.

**Dr. Pearson**. The district court also excluded Dr. Pearson's opinion that the preclinical evidence is consistent with a causal relationship between prenatal acetaminophen exposure and ASD and ADHD. *See* A-2017-2203. Dr. Pearson principally evaluated animal studies, which he acknowledged had divergent results. Yet he insisted that the studies suggesting *less* hyperactivity or impulsivity in rodents nonetheless supported his opinion that acetaminophen can cause ASD and ADHD because "neurodevelopmental perturbation of prenatal APAP can manifest in various ways." SPA-140. The court found this "*ipse dixit* assertion that heterogeneity and outright inconsistency of results don't ultimately matter," made in "a single paragraph in the conclusion section," to be "a deviation from the principles of scientific reliability" and thus grounds for exclusion. *Id*.

**Dr. Louie**. The district court found Dr. Louie's dose-response opinion was unreliable because he had failed to address "obvious issues" with his assertion that 28 days of acetaminophen use during pregnancy doubles a child's risk of ASD or ADHD. SPA-143; *see* A-2726-2872. Those issues included the potential significance of when during pregnancy a woman uses acetaminophen, or whether

22

the use is concentrated or sporadic. Because Dr. Louie provided no "basis for finding that such an unbounded use of acetaminophen poses any risk," his opinion was unreliable and inadmissible. SPA-143.

## SUMMARY OF ARGUMENT

**I.** The district court did not abuse its discretion in concluding that Plaintiffs' experts' decision to conduct a shared causation analysis for ASD and ADHD—conditions with significant non-overlapping diagnostic criteria—lacked any reliable basis. While Plaintiffs cite examples of scientists conducting a single Bradford Hill analysis for multiple conditions, the district court did not hold that a shared analysis could *never* be appropriate. Rather, the court held that Plaintiffs' experts had not supplied a basis for conducting a shared causation analysis for ASD and ADHD specifically. Plaintiffs offer no substantive defense of that approach. Instead, they principally rely on a single meta-analysis that examined studies of symptoms associated with ASD and ADHD and referenced some Bradford Hill criteria in passing. That meta-analysis did not conclude acetaminophen caused ASD or ADHD, much less give any justification for a shared causation analysis. Plaintiffs have not explained, and cannot explain, why their experts should have been permitted to treat putative evidence that acetaminophen causes ADHD as evidence that acetaminophen also causes ASD, or vice-versa. The district court was right—and certainly did not abuse its considerable discretion—when it made the case-

23

specific judgment that Plaintiffs' experts had not shown that their transdiagnostic approach to ASD and ADHD was reliable.

**II.**  The district court also correctly held that, even if it were appropriate for Plaintiffs' experts to conduct a shared causation analysis for ASD and ADHD, their opinions would still be inadmissible because they did not apply their methodologies reliably.  The court took "a hard look" at each expert's opinions, as it was required to do, to ensure that the expert's methodology was "reliable at every step of the way." *Mirena II*, 982 F.3d at 123.  The court found that Plaintiffs' experts repeatedly engaged in "result-driven analysis," including "[c]herry-picking" of favorable findings, ignoring or downplaying contrary results, and disregarding the limitations placed on a study by its authors, among other hallmarks of unreliability.  SPA-54.  Plaintiffs fail to acknowledge most of these critiques, and instead argue that the court exceeded its role under Rule 702 and improperly took sides in a scientific debate.  But Rule 702 ***requires*** a trial court to ensure that an expert applies his methodology even-handedly to all of the evidence under consideration.  SPA-54.  It is not sufficient under *Daubert*, as Plaintiffs argue, that their experts could point to isolated quotes and findings in peer-reviewed articles.  The district court did not abuse its discretion in finding that Plaintiffs' experts had not reliably evaluated the available scientific evidence.

**III**.    This Court also can affirm the district court's judgment on the

alternative ground that federal law preempts Plaintiffs' claims. Plaintiffs' state-law claims flout the comprehensive framework established by the federal Pregnancy Warning Regulation in two ways. First, although the Pregnancy Warning Regulation provides for pregnancy-related warnings that FDA has approved, Plaintiffs argue that state law can require pregnancy-related warnings that have never even received FDA scrutiny. Second, according to Plaintiffs, those unapproved warnings must appear *in addition to* the general warning required by the Pregnancy Warning Regulation, even though the Regulation provides that a specific warning (if approved by FDA) should *replace* the general warning, not supplement it. Allowing the tort laws of fifty different states to dictate the piecemeal addition of specific, pregnancy-related warnings—unreviewed by FDA—alongside the FDA-mandated general warning would sow chaos, undermining the agency's stated policy of requiring "a single national pregnancy-nursing warning" to "help ensure that consumers receive clear, unambiguous, and consistent information on the labeling of OTC drugs." *Pregnant or Nursing Women*, 47 Fed. Reg. at 54,756.

## STANDARD OF REVIEW

This Court reviews a district court's decision to exclude expert testimony "under a highly deferential abuse of discretion standard." *Mirena II*, 982 F.3d at 122. "A decision to admit or exclude expert scientific testimony is not an abuse of discretion unless it is manifestly erroneous." *Id.* (quoting *Amorgianos v. Nat'l R.R.*

25

*Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).  This highly deferential standard of review applies "as much to the trial court's decisions about *how to determine reliability* as to its ultimate conclusion."  *Id*. (quoting *Amorgianos*, 303 F.3d at 265).  A district court thus "has broad discretion in determining 'what method is appropriate for evaluating reliability under the circumstances of each case.'"  *Id*. (quoting *Amorgianos*, 303 F.3d at 265).

This Court "review[s] *de novo* a district court's application of preemption principles."  *N.Y. SMSA Ltd. P'ship v. Town of Clarkston*, 612 F.3d 97, 103 (2d Cir. 2010).

## ARGUMENT

### I. The District Court Did Not Abuse Its Discretion in Holding Plaintiffs' Experts' Transdiagnostic Approach to ASD and ADHD Was Unreliable.

The district court correctly held that the general-causation opinions offered by Dr. Baccarelli and Dr. Cabrera—the only two experts who offered full general-causation opinions that Plaintiffs defend on appeal—were inadmissible because they employed an unreliable "transdiagnostic approach," rather than conducting separate analyses and rendering discrete opinions for both ASD and ADHD.[18]  The two conditions are, as the court observed, "undeniably distinct," SPA-65, and Plaintiffs'

---

[18] Plaintiffs criticize the district court for using the phrase "transdiagnostic approach" which Plaintiffs claim "appears *nowhere* in Dr. Baccarelli's report."  Br. 29.  But Dr. Hollander used the phrase extensively in his report, *see* A-2468, on which Dr. Baccarelli relied.  SPA-68-69.

experts did not adequately explain why they could appropriately assess causation for one condition by relying on studies pertaining to the other. Instead, their transdiagnostic approach served only to "obscure[] limitations in the scientific literature," SPA-63, giving the experts a broader set of studies from which to cherry-pick favorable findings.

Plaintiffs do not and cannot dispute the district court's observation that ASD and ADHD are "undeniably distinct" conditions. SPA-65. An ADHD diagnosis does not entail the same deficits in social-emotional reciprocity, interpersonal communication, and building relationships as an ASD diagnosis, nor the same highly distinctive behaviors—such as repetitive movements, rigid adherence to routine, highly restricted interests, and sensory sensitivity. *See supra* Section I.B. ADHD is also several times more prevalent than ASD, affecting more than 7% of children. *See supra* Section I.C. And according to Dr. Baccarelli, approximately two-thirds of children with ASD do *not* exhibit ADHD symptoms. A-1783.

Despite the non-overlapping populations and diagnostic criteria for the two conditions, Plaintiffs' experts considered evidence relating to ASD, ADHD, and other neurodevelopmental outcomes without any differentiation. For example, there were only two studies assessing the connection between prenatal acetaminophen exposure and an ASD diagnosis at the time of the court's decision, and neither had even found an independent association, much less evidence to support a causal

relationship.  SPA-26; *see supra* Section I.D.  But Plaintiffs' experts sidestepped this near-total lack of support for a causation opinion as to ASD by conducting a single causation analysis for both ASD and ADHD.  Lumping studies pertaining to a whole variety of conditions and behaviors together also obscured "the tensions among the studies and [their] contradictory conclusions."  SPA-63.  Equally troublingly, including such a broad set of studies in the evidence base permitted the experts to pick out studies "depend[ing] on whether the study's result supports [their] ultimate opinion."  SPA-65.

The expert whom Plaintiffs retained to defend the transdiagnostic approach, Dr. Hollander, did not shore up any of the deficiencies the district court identified, and the court rightly excluded his opinion.  As the court noted, Dr. Hollander did not even *attempt* to explain how a shared Bradford Hill analysis for ASD and ADHD should be structured.  SPA-128.  Instead, he merely observed "that ASD and ADHD share *some* symptoms and are sometimes co-morbidities," SPA-132, and that "there *may* be overlap in the underlying biology of *some* of the symptoms," SPA-129.  The court rightly concluded that those unremarkable observations do not constitute "carte blanche for conducting a single causal analysis for these two disorders."  SPA-132.

Dr. Hollander tried to plug the obvious gaps in his opinion in his rebuttal report, when he asserted that "[i]f acetaminophen exposure during pregnancy causes hyperactivity in ASD and ADHD individuals, and if hyperactivity is a common

28

feature of ADHD and ASD, then acetaminophen causes ADHD and ASD." SPA-133 n.77. But, as the district court observed, Dr. Hollander "walked back" this claim in his deposition, conceding that he did *not* opine that "if acetaminophen is associated with hyperactivity, then it must also cause ASD and ADHD." SPA-133. Notably, Plaintiffs do not defend that unsupportable opinion on appeal.

Instead, Plaintiffs suggest that Dr. Hollander did not need to opine that proof of causation for ADHD is also proof of causation for ASD, and that his opinion that "studies showing a link between APAP and ADHD are *relevant* to whether APAP is linked to ASD, and vice versa" is sufficient. Br.58. But if studies regarding ADHD are merely *relevant* to ASD, then Dr. Hollander was required to explain *how* they are relevant, including how much weight they should receive in a causation analysis for ASD, and vice-versa. Yet Dr. Hollander failed to explain "how to structure a reliable transdiagnostic Bradford Hill analysis" for ASD and ADHD, SPA-128, leaving only his abstract observations about the relationship between the two conditions. The district court did not make a manifest error when it determined that those vague assertions were "insufficiently tethered to the transdiagnostic Bradford Hill analyses" that Plaintiffs sought to support. SPA-133.

None of Plaintiffs' other scattershot arguments undermine the district court's determination that Drs. Baccarelli and Cabrera did not adequately support their transdiagnostic approach to ASD and ADHD. Plaintiffs' suggestion that the court

wrongly held that studies looking at "*symptoms* of ASD and ADHD," as opposed to diagnoses, "should be off limits" misunderstands the court's opinion. Br.31. The court did not hold that studies of symptoms rather than diagnoses could never be considered in a causation analysis. The problem was that none of the experts explained *how* symptoms studies should factor into the causation analysis. As the court noted, "there was no separate analysis of, for instance, the consistency among the findings in those symptom studies, the strengths of any association, or any other relevant Bradford Hill factor, before the results of those studies were combined with the conclusions [the experts] drew from studies of ASD and ADHD." SPA-128. That "unstructured approach" lacked any scientific basis and "permitted cherry-picking" and "a results-driven analysis." *Id.*[19]

Plaintiffs also attempt to salvage their transdiagnostic approach by citing studies that supposedly conducted combined Bradford Hill analyses for multiple conditions, *see* Br.30-31, and a "framework for transdiagnostic research" from the National Institute for Mental Health, *see* Br.57. But those examples, which have nothing to do with ASD and ADHD, are beside the point. The district court never

---

[19] Additionally, the FDA and JJCI reports that Plaintiffs cite as evidence that symptom studies can be considered in a causation analysis, Br.57, are irrelevant because they looked broadly at the association between acetaminophen and neurodevelopmental disorders; they did not set out to investigate whether acetaminophen causes ASD and/or ADHD specifically.

30

suggested that transdiagnostic approaches to causation are categorically unreliable. On the contrary, the court made clear that, "[w]hile a transdiagnostic Bradford Hill analysis may be appropriate if the basis for doing so is properly supported, *that basis has not been supplied here*." SPA-69 (emphasis added). Plaintiffs thus get nowhere by pointing to examples where scientists took a transdiagnostic approach to other conditions. Plaintiffs' burden is to show, by a preponderance of the evidence, that a transdiagnostic approach is appropriate as to ASD and ADHD specifically. *See* Fed. R. Evid. 702(d) (requiring an expert's opinion to "reflect[] a reliable application of the principles and methods *to the facts of the case*") (emphasis added).

Plaintiffs point to just one study that they claim conducted a shared causation analysis for ASD and ADHD, Alemany 2021, but the district court correctly determined that the study's "cursory reference to Bradford Hill factors" could not support Plaintiffs' experts' transdiagnostic approach. SPA-127 n.73; *see* SPA-69-70. Alemany 2021 does not contain any justification for conducting a shared causation analysis for ASD and ADHD, nor does it even claim to have conducted one. Instead, the study—a meta-analysis that primarily examined studies of symptoms rather than diagnoses—simply referred to five of the nine Bradford Hill criteria in one short paragraph, without clearly differentiating between evidence pertaining to ASD and ADHD. A-4467. The study never concluded that prenatal acetaminophen exposure causes either condition. That one brief paragraph does not

31

constitute a genuine Bradford Hill analysis, much less a reasoned defense of a transdiagnostic approach to ASD and ADHD.[20]

The district court did not abuse its discretion in finding that Plaintiffs' experts' combined causation analysis for ASD and ADHD was unreliable. The general-causation opinions of Dr. Baccarelli and Dr. Cabrera are thus inadmissible, leaving Plaintiffs with no competent evidence that acetaminophen is capable of causing their alleged injuries. This Court need go no further to affirm.

## II. The District Court Did Not Abuse Its Discretion in Finding That, Even If Plaintiffs' Transdiagnostic Approach to ASD and ADHD Were Reliable, Plaintiffs' Experts' Opinions Still Should Be Excluded.

The district court also determined that, even if it accepted Plaintiffs' transdiagnostic approach to ASD and ADHD, Plaintiffs' experts' opinions would still have to be excluded for multiple reasons—most prominently the experts' "[c]herry picking" and "result-driven analysis." SPA-54 (quoting *Daniels-Feasel*, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021), *aff'd*, 2023 WL 4837521). Remarkably, Plaintiffs entirely ignore the court's findings of cherry-picking and outcome-driven reasoning, even though the opinion made those critiques repeatedly.

---

[20] An amicus brief submitted by three epidemiologists asserts that "a joint Bradford-Hill analysis of ASD and ADHD outcomes would be an accepted practice," but includes no substantive defense of that assertion and does not explain how such a joint analysis should be structured. Br. of Epidemiologists, Dkt.134, at 2. In any event, an amicus brief cannot serve as an additional expert opinion or otherwise supplement the record on appeal.

*See, e.g.*, SPA-54, -62, -98 -100, -104, -109, -120, -121, -128, -139. Instead, Plaintiffs effectively argue that experts should be *permitted* to cherry-pick favorable results at will.[21] Plaintiffs contend that a "simple principle emerges" from the *Daubert* case law (although they can cite no case endorsing this supposed principle): that "where an expert's analysis aligns with analysis performed by peers in the relevant literature, it *must* constitute a 'reliable application' of scientific 'principles and methods' as a matter of law." Br.28 (quoting Fed. R. Evid. 702). In other words, if an expert can identify a single peer-reviewed study that can be read (even partially) to support his opinion, his testimony is *ipso facto* reliable and admissible under Rule 702.

But multiple courts of appeals, including this Court, have held that a district court can and should exclude an expert who engages in "cherry-picking" or "[r]esult-driven analysis," which "undermines the principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *Lipitor*, 892 F.3d at 634; *see In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 347 (6th

---

[21] One of Plaintiffs' amici makes this argument explicitly, contending that "cherry-picking of favorable results, ignoring of confounding factors (such as genetics), and ignoring or devaluing other studies that arrived at different results" are "precisely the kinds of shortcomings that should more appropriately be addressed by 'vigorous cross-examination.'" Br. of Am. Ass'n for Justice, Dkt.130, at 14 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

Cir. 2024) (same); *Daniels-Feasel*, 2023 WL 4837521, at *3 (affirming exclusion where expert "cherry-picked only favorable studies to support his causal conclusion"). A general-causation expert has not, therefore, necessarily applied a reliable methodology just because he can pick out favorable data, quotes, or conclusions from one or more studies.

Plaintiffs' superficial approach to reliability runs headlong into this Court's holding in *Mirena II* that Rule 702 "require[s]" the trial court to "take a hard look" at the expert's report and ensure that his methodology is "reliable at every step of the way." *Mirena II*, 982 F.3d at 123. In *Mirena II*, the district court had conducted a thorough, 156-page analysis of the plaintiffs' experts' general-causation reports and excluded their opinions that the defendant's intrauterine device could cause intracranial hypertension. *Id*. at 122. The plaintiffs argued on appeal, as Plaintiffs do here, that the court had overstepped its role by conducting an analysis that was "too searching." *Id*. at 123. This Court rejected Plaintiffs' argument and affirmed, holding that the court's "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from the facts, and how the expert applies the facts and method to the case at hand" was not only appropriate, but "required." *Id*. (quoting *Amorgianos*, 303 F.3d at 267).

If, as part of its mandatory "hard look" at an expert's opinion, *id*., the court finds that the expert touts favorable studies and disregards unfavorable ones without

a sound explanation, then the expert must be excluded for engaging in cherry-picking rather than applying a reliable methodology. Here, the district court closely examined each expert's opinion and correctly determined that, among other fatal flaws, the experts had used outcome-driven reasoning, rather than applying a reliable methodology to the relevant evidence. Plaintiffs' cursory attacks on the court's detailed analysis do not reveal any error, much less a "manifest[]" one that would justify reversal under the "highly deferential abuse of discretion standard" that applies here. *Mirena II*, 982 F.3d at 122.

### A.  The District Court Properly Excluded Dr. Baccarelli.

In conducting his Bradford Hill analysis, Dr. Baccarelli put "great weight" on three factors:  consistency, strength of association, and dose-response relationship. SPA-89. The district court found that his analyses of both consistency and strength of association were so unreliable that, independently, each would warrant the exclusion of his opinion. SPA-81, -86. The court also found that Dr. Baccarelli's failure to adequately address genetic confounding provided an independent ground for exclusion. SPA-94. Plaintiffs have identified no error in the court's consideration of those three issues or any of the other Bradford Hill criteria.

### 1.  Consistency

Plaintiffs devote less than two pages to challenging the district court's eleven-page analysis of Dr. Baccarelli's consistency opinion. Plaintiffs simply recite Dr.

35

Baccarelli's conclusion, give a few quotes from scientific articles that seem to support him, and claim the reliability analysis should have ended there. Br.33-34. But the district court had a duty to take a "hard look" at Dr. Baccarelli's reasoning, *Mirena II*, 982 F.3d at 123, and it found that he "fail[ed] to engage meaningfully with the inconsistencies among the studies, inconsistencies which exist to a remarkable degree." SPA-71.

First, Dr. Baccarelli's assertion that the literature regarding ASD was consistent, with three studies to support an association, lacked any discernible basis. As the court explained, Dr. Baccarelli appeared to be relying on a study that assessed acetaminophen use only in the hours immediately before delivery (as opposed to the pregnancy as a whole), a study that did not involve ASD diagnoses and included "milder dysfunctions," and a study that found *no* independent association between prenatal acetaminophen use and ASD diagnoses. SPA-73-74. Notably, Dr. Baccarelli did not acknowledge the conclusion of the most recent meta-analysis, Ricci 2023, which found that studies regarding ASD "were either too few or too heterogeneous in their measures to pool." SPA-75.

Second, Dr. Baccarelli relied extensively on studies of related *symptoms* of ASD and ADHD, rather than *diagnoses*. Regardless of whether that approach is reliable, Dr. Baccarelli failed to acknowledge the many inconsistencies in those results, both within studies and between them. Although the district court addressed

36

these inconsistencies at length, SPA-75-78, Plaintiffs' brief ignores them.

Even the studies that did use formal diagnoses, moreover, are inconsistent. For example, two ADHD studies produced conflicting results regarding in which trimesters acetaminophen use is, or is not, associated with an increased risk of ADHD. *See* SPA-28, -31. And as discussed below, the Gustavson 2021 study strongly indicates that any observed association between prenatal acetaminophen exposure and an ADHD diagnosis is the result of genetic confounding.

Third, Dr. Baccarelli's reliance on meta-analyses could not save his consistency opinion. Contrary to Plaintiffs' assertion, Br.34, the district court did not ignore Gou 2019 and Alemany 2021; the court explained that Gou examined only studies relating to ADHD, not ASD, and that both studies advised "caution" in inferring a causal relationship. SPA-78-81.[22] It was Dr. Baccarelli who ignored relevant literature by failing to mention that the most recent and comprehensive meta-analysis, Ricci 2023, concluded there were too few studies to conduct a meta-analysis for ASD and that, while studies showed "a small increase in risk" for ADHD, the certainty of the evidence was "low." SPA-80.

Because of Dr. Baccarelli's "wholesale failure to address the highly

---

[22] The two other studies Plaintiffs quote in their brief are not meta-analyses, but rather an opinion article (Olsen & Liew) and a review that looked only at studies finding a positive association (Bauer & Kriebel).

heterogeneous nature of the studies," SPA-81, the district court correctly found that his opinion was "connected to existing data only by [his] *ipse dixit*." *Gen. Elec. Co. v. Joiner*, 522 U.S. 1336, 146 (1997).

### 2. Strength

Plaintiffs claim Dr. Baccarelli "did not attempt to oversell" the strength-of-association factor, Br.34, but in fact he put "great weight" on the factor. SPA-82. He claimed that the association he observed was "moderate," yet acknowledged that most of the studies on which he relied found risk ratios between 1.0 and 2.0— meaning the risk of an adverse outcome for those with prenatal exposure to acetaminophen was greater than, but no more than double, the risk for those without exposure. SPA-83. Dr. Cabrera described those same risk ratios as "low," SPA-111, and FDA has described the associations in some of the relevant studies as "weak." SPA-83.

To bolster the association, Dr. Baccarelli speculated—without any reliable basis—that the studies' reliance on maternal self-reports of acetaminophen use biased the results downward. Dr. Baccarelli also cited two studies that used more objective biomarkers of acetaminophen and found stronger associations, but the district court rightly pointed out that—as the study authors acknowledged—one of the studies could only detect acetaminophen use in the hours before delivery, and the other had a very wide confidence interval and did not control for significant

potential confounders.  SPA-85-86.

Plaintiffs engage none of these critiques in their brief, and instead simply cite the Ricci study's statement that its meta-analysis showed a "small to moderate" association between prenatal acetaminophen exposure and neurodevelopmental disorders.  Br.35.  Those three words, one of which is "small," do not invalidate the district court's finding that Dr. Baccarelli had not "applied with sufficient rigor his profession's methodology" when he placed "great weight" on a supposedly "moderate" association.  SPA-86, -89.

### 3.    Genetic Confounding

Especially given the relative weakness of Dr. Baccarelli's claimed association between prenatal acetaminophen exposure and disorders like ASD and ADHD, which are both known to be highly heritable, the district court found it "particularly incumbent" upon Dr. Baccarelli to carefully account for the possibility of genetic confounding.  SPA-86.  Instead, Dr. Baccarelli's discussion of genetic confounding was "incomplete, unbalanced, and at times misleading," which by itself warranted excluding his opinion.  SPA-98.

The court found Dr. Baccarelli's analysis of two sibling-control studies from the same birth cohort to be a "stark example" of his "result-driven analysis."  SPA-98.  Gustavson 2021 found that children exposed to acetaminophen *in utero* were ***not*** significantly more likely to be diagnosed with ADHD than their unexposed

siblings (a finding since confirmed with a much larger sample by Ahlqvist 2024). But Dr. Baccarelli downplayed the Gustavson study and instead credited Brandlistuen 2013, an earlier study on the same cohort of children that did find a significant association. Critically, however, the earlier study took place before any of the children were old enough to be diagnosed with ADHD, and instead analyzed the association between prenatal acetaminophen exposure and a less well-defined set of behavioral outcomes. Dr. Baccarelli discounted unfavorable studies—even one that used the very same questionnaire as Brandlistuen 2013 to assess children's symptoms—on the ground that they "did not have ADHD as an endpoint" and instead were "forced to rely on less clearly defined child outcomes." SPA-66. Yet he elevated a study with the same design over a study that *did* have ADHD diagnoses as an endpoint, simply because the results supported his opinion. The district court found that this clear instance of cherry-picking badly undermined Dr. Baccarelli's analysis of genetic confounding. SPA-98-99. Yet Plaintiffs have no response.[23]

---

[23] Ignoring Dr. Baccarelli's inconsistent treatment of studies not involving diagnoses, Plaintiffs instead assert that he was justified in discounting Gustavson's null result because sibling-control studies supposedly tend to underestimate associations. The district court did not address this argument because Plaintiffs did not make it below, and this Court need not consider it. *United States v. Gomez*, 877 F.3d 76, 94-95 (2d Cir. 2017). In any event, Dr. Baccarelli merely speculated that sibling-control studies could underestimate the association by controlling for some unidentified shared family characteristic that might amplify the effect of prenatal acetaminophen exposure. *See* A-1861-63.

Dr. Baccarelli's failure to grapple with unfavorable results did not end there. Ystrom 2017, a study on the same cohort of children analyzed by Gustavson and Brandlistuen, found that *paternal* use of acetaminophen, as well as maternal use during pregnancy, was associated with ADHD. That result led the authors to conclude that "the causal role of acetaminophen in the etiology of ADHD can be questioned." SPA-99. Dr. Baccarelli's only response to this result was to speculate that paternal use might be a proxy for maternal use because "fathers and mothers often share medications and medicine cabinets." SPA-99-100. The court reasonably found that speculation to be unreliable. The court also found Dr. Baccarelli's analysis unreliable because many of the studies on which he relied expressly acknowledged the need for more research to address genetic confounding, SPA-95, -100, yet Dr. Baccarelli "exceed[ed] the limitations the authors themselves place[d]" on their studies." *Daniels-Feasel*, 2021 WL 4037820, at *4.

Plaintiffs address none of these flaws in Dr. Baccarelli's analysis, and instead simply quote from two studies (both of which predated Gustavson's sibling-control study) whose authors believed their results weighed against any genetic confounding. Br.48. Plaintiffs are engaged in the same sort of cherry-picking as Dr. Baccarelli.[24] A general-causation expert may not pick out a handful of favorable

---

[24] Plaintiffs resort to cherry-picking yet again when they lift selective quotations from articles and testimony by Defendants' experts to suggest they agree there are reasonable grounds for Plaintiffs' experts' opinions. For example, Plaintiffs make

41

studies and demand that the court defer. He must, instead, consider all of the relevant evidence using a reliable methodology. The district court did not abuse its discretion in determining that Dr. Baccarelli's outcome-driven analysis did not meet that requirement.

### 4. Other Bradford Hill Criteria

The district court found that Dr. Baccarelli's unreliable consideration of consistency, strength, and genetic confounding each independently required his exclusion, regardless of his opinions on the other Bradford Hill criteria. It also correctly determined that Dr. Baccarelli's analyses of several other criteria were fatally unreliable.

Regarding dose-response, the only other factor on which Dr. Baccarelli put "great weight," the court found that Dr. Baccarelli did not adequately take into account that *none* of the studies on which he relied recorded the actual dosages taken by expectant mothers. SPA-89, -90. The court did not abuse its discretion—which extends to determining "what method is appropriate for evaluating reliability"—in raising that obvious limitation of those studies. *Mirena II*, 982 F.3d at 122.

---

much of one defense expert's testimony that there is an "ongoing debate" regarding a causal relationship between acetaminophen and ASD and ADHD. Br.2, Br.40 (citing A-4003). But the same expert made clear no "reasonable epidemiologist could disagree" with her conclusion that there is "no … credible support for a causal association." A-4109.

Plaintiffs' citation of studies that referred to a dose-response effect in passing, Br.39-40, without grappling with this issue, does not undermine the court's conclusion.[25]

Similarly, on the temporality factor, the court reasonably found insufficient Dr. Baccarelli's one-paragraph observation that prenatal exposure to acetaminophen precedes diagnosis. When evaluating the temporality factor in a Bradford Hill analysis, the question is whether the subject's exposure to the alleged toxin precedes the *development* of the condition at issue. Here, it is currently unknown when the neurological underpinnings of ASD and ADHD develop in the fetal brain. SPA-88. If it were sufficient to point out that exposure precedes the *diagnosis* of a disorder, as Plaintiffs contend, then temporality would *always* be present when the exposure occurs *in utero*.

As to the biological-plausibility factor, the district court concluded that Dr. Baccarelli's opinion "fail[ed] to reflect a reliable application of scientific principles," incorporating its analysis on Dr. Cabrera's opinion regarding this same issue. SPA-91-92; *infra* Section II.B. In any event, the court made clear that the ultimate admissibility of Dr. Baccarelli's causation opinion did not turn on the presence or absence of a reliable biological plausibility opinion. SPA-92. Finally,

---

[25] Plaintiffs also claim that a defense expert previously acknowledged that a dose-response relationship existed, Br. 40, but the cited paper was simply reporting what another study had stated. A-4772.

43

the court reasonably determined that the analogy factor, on which Dr. Baccarelli placed "very little weight," was not met by his assertion, without any citation or discussion of chemical structure, that valproic acid has a biochemical effect similar to acetaminophen. SPA-93.[26]

### 5. Navigation Guide

The district court correctly determined that Dr. Baccarelli's Navigation Guide opinion was inadmissible too. The Navigation Guide is a "tool used to summarize evidence" and rate each study's quality—not a methodology designed to distinguish a causal relationship from a mere association. SPA-101. Moreover, the Navigation Guide is meant to be employed by teams of analysts at regulatory agencies, not by an individual. *Id*. Plaintiffs cite three studies in which they claim "[i]ndependent scientists … use[d] the Navigation Guide methodology to evaluate causation." Br.49. But none of the cited studies actually used the Navigation Guide to establish that a causal relationship, as opposed to an association, existed. *See* A-4716; A-4740; A-4756.

Dr. Baccarelli's Navigation Guide opinion would be inadmissible in any case because, as the district court detailed, it suffered from all the same flaws as his

---

[26] The court did not rule that Dr. Baccarelli's analyses of specificity and experiment, two other criteria on which he placed "very little weight," were unreliable. SPA-87, -93, -94. Plaintiffs' arguments regarding those two criteria are, therefore, of no consequence.

Bradford Hill analysis: he cherry-picked favorable studies and either ignored or used specious reasoning to downplay contrary findings, most notably in his inconsistent treatment of the Gustavson and Brandlistuen sibling-control studies. SPA-102-105. Plaintiffs address none of these issues in their brief.

### B. The District Court Properly Excluded Dr. Cabrera.

The district court was right to find that Dr. Cabrera's general-causation opinion was inadmissible because he did not explain how he weighed the various Bradford Hill criteria. Plaintiffs do not suggest that Dr. Cabrera explained the weight he gave each factor; rather, they contend that he was not required to do so. The law is to the contrary. As the Third Circuit has held, "[t]o ensure that the Bradford Hill/weight of the evidence criteria is truly a methodology, rather than a mere conclusion-oriented selection process . . . there must be a scientific method of weighting that is used and explained." *Zoloft*, 858 F.3d at 796 (quoting *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 607 (D.N.J. 2002)). Multiple courts in this circuit have now explained that, without weights, multi-criteria methodologies like Bradford Hill "are virtually standardless[,] and their applications to a particular problem can prove unacceptably manipulable." SPA-110 (quoting *Mirena II*, 341 F. Supp. 3d at 247). The absence of weights "effectively disables a finder of fact from critically evaluating [an expert's] work" because the court is left to guess whether, if it disagrees with the expert's evaluation of one or

45

more criteria, the causation opinion can still stand on the other criteria. *Id.* (quoting *Mirena II*, 341 F. Supp. 3d at 248).

Independently, the court excluded Dr. Cabrera's opinion because his "cursory and unreliable" assessment of the Bradford Hill criteria was marred by the same sort of cherry-picking as Dr. Baccarelli's analysis. SPA-110. Regarding consistency, the court did not exclude Dr. Cabrera's discussion simply because it was short, as Plaintiffs suggest, Br.31-32, but because it did not account for the "heterogeneous nature of the epidemiological evidence." SPA-111. Regarding strength, Dr. Cabrera admitted the effect sizes found in the literature were "low," *id.*, yet found the strength-of-association factor to be met simply because there was evidence of a dose-response effect. But strength and dose-response are independent factors, and Dr. Cabrera provided no explanation to justify conflating them. Plaintiffs note that Dr. Cabrera cited a report from the National Toxicology Program that lists "dose-related effect" as a factor in determining "developmental toxicity." Br. at 52. But the fact that dose-response is *also* a factor does not justify calling a weak association strong. And even if that conflation of two distinct criteria were appropriate, it would not help Dr. Cabrera because, as explained above, the evidence of dose-response "is similarly weak at best." SPA-111; *see supra* at Section II.A.4. Dr. Cabrera also claimed in his consideration of the experiment criterion that the evidence from animal studies was consistent, but this ignored that those studies "reported

46

conflicting or unreplicated individual outcomes with varying relevance to either ADHD or ASD."  SPA-112.

Nor did the district court abuse its discretion in excluding Dr. Cabrera's opinion regarding biological plausibility, to which he devoted more attention than the other Bradford Hill criteria.  Plaintiffs contend that the court applied an inappropriately demanding standard, Br.41-42, but in fact the court required the same showing as the authorities on which Plaintiffs rely:  the identification of a "biological mechanism," *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 20 (1st Cir. 2011), that is "credible in light of what is known from science and medicine about the human body and the potentially offending agent."  *Id*. at 25.

Dr. Cabrera did not satisfy that requirement.  He posited that a byproduct of acetaminophen binds to an antioxidant called glutathione (GSH) and that the depletion of GSH causes oxidative stress—an excess of the highly reactive molecules known as "free radicals"—leading to cell injury and/or death in the developing brain.  But the court correctly noted that the "Adverse Outcome Pathway" ("AOP") on which Dr. Cabrera relied, which describes a specific chemical pathway leading to neurological injury during fetal development, was "based mainly on developmental effects observed after an exposure to the heavy metal, mercury." A-5145, -5149, -5188; *see* SPA-114.  Plaintiffs contend that the court ignored the fact that the AOP expressly applies to acetaminophen, but it is Plaintiffs who have

misread the document. The AOP refers to independent documents called "Key Event[s]," and the Key Event for "oxidative stress" lists acetaminophen as a stressor. A-5187. Oxidative stress is indeed a biologically plausible for *liver* toxicity from an acetaminophen overdose, as the district court noted, SPA-115-16, but neither the AOP nor Key Event suggests acetaminophen can cause oxidative stress in the brain.

Moreover, like the rest of Plaintiffs' experts' opinions, Dr. Cabrera's biological plausibility opinions were based on egregious cherry-picking. He did not acknowledge that both studies on the topic show acetaminophen does *not* reduce GSH levels in the brain. SPA-116-117. Dr. Cabrera instead relied on a single "isolated finding[]"—one of sixteen measurements in one of two studies—to conclude that acetaminophen can cause oxidative stress in the brain and thus ASD or ADHD. SPA-118. Dr. Cabrera was similarly selective in his discussion of behavioral studies, downplaying or ignoring unfavorable findings and exceeding limitations that study authors placed on their conclusions. SPA-118-120.[27]

---

[27] Plaintiffs emphasize that, based on some studies that have found higher levels of oxidative stress in ASD or ADHD patients diagnosed years after birth, defense experts acknowledged such evidence "suggested" a connection between oxidative stress and ASD/ADHD "pathophysiology." Br.55-56. But as both Drs. Louie and Pearson agreed, such studies cannot provide evidence on whether those oxidative stress differences are a *cause* of the conditions or a *consequence*. A-3876; A-3331-3332. They thus shed no light on whether acetaminophen causes ASD or ADHD.

48

### C.    The District Court Properly Excluded Dr. Pearson.

Because only Dr. Baccarelli and Dr. Cabrera offered timely general-causation opinions that addressed the human data, the Court could affirm the district court's grant of summary judgment without considering the other experts' opinions.  But in any case, the court correctly excluded the opinions of the other experts as well.

In rendering his opinion that preclinical evidence supported a causal relationship between acetaminophen and ASD and ADHD, Dr. Pearson acknowledged that the animal studies were highly inconsistent, with most results showing no changes between dosed and control animals, some results showing a behavioral effect consistent with ASD or ADHD, and other results (sometimes even in the same study) showing a behavioral change in the opposite direction.  But Dr. Pearson claimed, without citation, that a behavior change in *any* direction supported his opinion because "neurodevelopmental perturbation of prenatal APAP can manifest in various ways in terms of directionality."  SPA-140.  That "heads I win, tails you lose" approach is facially unreliable, and the district court was right to reject it.  For example, it is fundamentally unreliable for an expert to assert without authority that a study showing a *decrease* in hyperactivity supports a causal relationship with ADHD.  The authorities that Plaintiffs cite, Br.59, do not remotely support the view that a behavioral change in one direction can support causation in the opposite direction, and Dr. Pearson did not cite them for that purpose.

### D. The District Court Properly Excluded Dr. Louie.

Finally, the district court correctly concluded that Dr. Louie had not applied a reliable methodology to reach his dose-response opinion that 28 days of cumulative acetaminophen use during pregnancy is associated with an increased risk of ASD and ADHD. The court found that Dr. Louie had not adequately justified the suspect claim that it makes no difference *when* in the pregnancy the exposures take place, or whether the exposures are concentrated together or spread over weeks or months. Plaintiffs cite authorities that generally endorse the metric of cumulative exposure, Br.59-60, but such a blunt measure will not suffice for prenatal exposures—which take place alongside rapid neurological development—that allegedly result in neurodevelopmental disorders. The court reasonably determined that greater precision was necessary in the prenatal context, and certainly did not abuse its discretion regarding "how to determine reliability" in a particular case. *Mirena II*, 982 F.3d at 122 (emphasis omitted). Moreover, Plaintiffs do not even address the court's finding that Dr. Louie's opinion was "not supported by the seven studies on which he purports to have relied" because, among other reasons, he falsely claimed several studies involved diagnoses of ASD and ADHD and failed to acknowledge evidence of genetic confounding. SPA-144-147.

*   *   *

The district court rightly observed that the issues in this litigation "have great

50

public health significance" and that "[i]t matters to get this right." SPA-49. The court strove "to get this right" by scrutinizing the experts' claims and reviewing the scientific literature on which they relied. In undertaking that inquiry, the court did not act as an "armchair scientist[]" implementing its own public-health policy, as Plaintiffs contend. Br.1. Rather, it fulfilled Rule 702's mandate to take a "hard look" at each expert's opinion. *Mirena II*, 982 F.3d at 123. After completing its review, the court concluded that Plaintiffs' experts' opinions were inadmissible for multiple, independent reasons: Plaintiffs' experts had not adequately supported their transdiagnostic approach, and their opinions were shot through with cherry-picking and outcome-driven reasoning. Plaintiffs have not identified any flaws in the district court's analysis, much less established that the court's exclusion of the evidence was manifestly erroneous.

## III. In the Alternative, Plaintiffs' Claims Are Preempted by Federal Law.

Plaintiffs' claims also fail for the independent reason that their proposed warning conflicts with FDA's comprehensive regulatory framework governing warnings about pregnancy-related risks posed by OTC drugs. Because federal law bars Defendants from adding an unvetted warning about the putative risks of ASD and ADHD, Plaintiffs' state-law claims—all of which are predicated on the absence of such a warning—are preempted.[28]

---

[28] Below, Defendants argued for preemption on the additional ground that there is

Federal regulations preempt state law when promulgated "within the scope of [an agency's] congressionally delegated authority." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (quoting *New York v. FERC*, 535 U.S. 1, 18 (2002)). FDA exercised its delegated authority to promulgate the Pregnancy Warning Regulation, mandating a verbatim general warning and creating a process for FDA to provide for different warnings when warranted for specific products. The relevant question, as the district court recognized, is whether Defendants "could have unilaterally strengthened warnings on [their] label[s] without prior approval from the FDA." MDL.Dkt.145 at 17. If not, then "compliance with both state and federal law is a physical impossibility," and the state law requiring an additional warning is preempted. *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Under the Pregnancy Warning Regulation, compliance with both state and federal law is impossible: Defendants are required to give the verbatim warning mandated by the Regulation unless and until FDA, via the process set forth in the Regulation, mandates a different warning.

---

"clear evidence" FDA would reject Plaintiffs' proposed warning, given that FDA has repeatedly concluded that there is insufficient evidence of causation. *See* MDL.Dkt.589 at 30-37. The district court termed that argument "premature," stating that *Daubert* motions may shed light on the issue. *Id*. at 31. Defendants do not raise this distinct preemption argument as an alternative ground for affirmance only because it is too fact-bound for this Court to decide in the first instance.

In response to California's adoption of regulations requiring drugmakers to warn about pregnancy-related risks, FDA issued the Pregnancy Warning Regulation in 1982. The purpose of the rulemaking was to create "a single national pregnancy-nursing warning with a specified text" so that manufacturers would have to use the FDA-mandated warning rather than any different warning required by a state. *Pregnant or Nursing Women*, 47 Fed. Reg. at 54,756. FDA explained that a uniform national warning would "ensure that consumers receive clear, unambiguous, and consistent information" and thus was "necessary to ensure that OTC drugs are used safely and for their intended purposes." *Id*. The Regulation's "text, structure, history, and purpose" all establish that it is exclusive and preemptive. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

The Pregnancy Warning Regulation now provides, in relevant part, that:

(a) The labeling for all over-the-counter (OTC) drug products that are intended for systemic absorption, unless specifically exempted, shall contain a general warning under the heading "Warning" (or "Warnings" if it appears with additional warning statements) as follows: "**If pregnant or breast-feeding**, ask a health professional before use."

(b) Where a specific warning relating to use during pregnancy or while nursing has been established for a particular drug product in a new drug application (NDA) or for a product covered by an OTC drug final monograph in part 330 of this chapter, the specific warning shall be used in place of the warning in paragraph (a) of this section, unless otherwise stated in the NDA or in the final OTC drug monograph.

21 C.F.R. § 201.63.

Paragraph (a) sets forth the default rule that all covered OTC drugs must bear

53

the "general warning" advising women who are pregnant or breastfeeding to consult a medical professional before taking the product. *Id*. § 201.63(a). The label must repeat the "exact language" provided by the Regulation. 21 C.F.R. § 330.1(c)(2). Any deviation renders the product misbranded under federal law. *See id*. FDA has explained that this exact-language requirement effectuates the agency's "exclusivity policy," which "limit[s] monograph labeling terminology to specific words and phrases considered and approved by FDA." *Limitations of Labeling Terminology*, 47 Fed. Reg. 29,002, 29,002 (July 2, 1982). Indeed, in the Pregnancy Warning Regulation rulemaking, FDA explained that uniformity was so important that differing state warnings were not permitted even if the differences were only non-substantive variations in wording. *See Pregnant or Nursing Women*, 47 Fed. Reg. at 54,754 ("Alternative language will not be accepted.").

Paragraph (b) then describes circumstances in which a "specific warning" must be "used in place of" the general pregnancy warning. A specific warning will replace the general warning if, and only if, "a specific warning relating to use during pregnancy or while nursing has been established for a particular drug product in a new drug application (NDA) or for a product covered by an OTC drug final monograph." A warning can be "established" in an NDA or monograph only if FDA approves it. When FDA issued the Regulation, it explained that "a specific pregnancy-nursing warning that is required in a final OTC drug monograph [or

54

NDA] *supersedes* the general warning," unless otherwise stated in the monograph or NDA. *Pregnant or Nursing Women*, 47 Fed. Reg. at 54,755 (emphasis added).

Plaintiffs' putative state-law duty to add a specific warning about the alleged risks of ASD and ADHD is in irresolvable conflict with the federal regulatory scheme governing pregnancy-related warnings for OTC drugs. The Regulation must be read as creating an exclusive process for adding warnings regarding specific pregnancy-related risks. If state law could dictate the inclusion of such warnings, then the conditions the Regulation puts on the addition of those warnings would be superfluous. And state law could require that unapproved warnings *supplement* the FDA-mandated general warning, even though FDA determined that FDA-approved specific pregnancy-related warnings should be used "in place of" the general warning, unless an FDA-approved NDA or monograph provides otherwise. 21 C.F.R. § 201.63(b). This would have the absurd consequence of prohibiting a manufacturer from making even purely stylistic changes to the phrasing of FDA's general warning but allowing the same manufacturer to add entirely new specific warnings that significantly change the overall message without any agency oversight at all.

Because the Pregnancy Warning Regulation creates an exclusive process for adding pregnancy-related warnings to an OTC drug's label, it is "a physical impossibility" for Defendants to comply with both the Regulation and Plaintiffs'

asserted state-law duty. *Marentette*, 886 F.3d at 117. Defendants cannot add Plaintiffs' preferred warning to acetaminophen's label because the Regulation: (1) only authorizes specific warnings that "ha[ve] been established" by FDA; and (2) requires such warnings to be used "in place of" the general warning, unless FDA provides otherwise. 21 C.F.R. § 201.63(b). Plaintiffs' putative state-law duty thus conflicts with federal law and is preempted.

The history and purpose of the Pregnancy Warning Regulation confirm that it excludes and preempts any differing state-law requirements. In promulgating the Regulation, FDA explained that it establishes "a single national pregnancy-nursing warning with a specified text" and concluded, after notice and comment, that "differing State OTC drug pregnancy-nursing warning requirements" would be "preempted by the regulation as a matter of law." *Pregnant or Nursing Women*, 47 Fed. Reg. at 54,756. Permitting "[d]iffering State requirements" to go into effect, FDA observed, would "conflict with the Federal warning, cause confusion to consumers, and otherwise weaken the Federal warning," which would "prevent accomplishment of the full purpose and objectives of the agency in issuing the regulation." *Id*. Under the Regulation, therefore, manufacturers are "able to use the new FDA labeling ***without also being required to use the pregnancy-nursing warning labeling required by any State***." *Id* at 54,757. (emphasis added).

FDA's interpretation of the Regulation as exclusive and preemptive follows

56

from the Regulation's text and structure. But even were the Court to find the Regulation ambiguous, FDA's contemporaneous interpretation of its own Regulation, to which it has adhered for over forty years, would be entitled to deference. *See Kisor*, 588 U.S. at 574-75; *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (giving weight to agency's interpretation of its regulations to preempt a state-law tort suit). FDA's interpretation of its Regulation as exclusive is an "authoritative" construction, adopted through notice-and-comment rulemaking, that reflects the agency's "fair and considered judgment." *Kisor*, 588 U.S. at 577-79. And FDA's choice to exercise its delegated authority to create a verbatim national warning, along with a process to vary the warning where appropriate, reflects a policy judgment about the best way to communicate potential risks to pregnant and nursing patients that implicates the agency's "substantive expertise" in public health. *Id*. at 577-78.

The district court nonetheless concluded that Plaintiffs' claims were not preempted because the Regulation "does not address the ability of manufacturers to supplement the general warning with safety warnings specific to their OTC drug." MDL.Dkt.145 at 22-23. But, as explained above, paragraph (b) must be read as creating the exclusive process for adding specific pregnancy-related warnings to OTC labels. Otherwise, state law could require any number of specific warnings to appear alongside the general warning, in contradiction of FDA's determinations that

57

specific warnings must be approved by FDA and, unless FDA says otherwise, must replace the general warning, not "supplement" it. *Id*.

The court thought it implausible that the Pregnancy Warning Regulation would "bar[ ]" manufacturers "from adding to their labels truthful warnings about use of their own drugs during pregnancy" because such a rule "would constitute a massive shift from a foundational principle … that manufacturers are responsible at all times for the adequacy of their drug labels." MDL.Dkt.589 at 23. The district court drew that principle from *Wyeth v. Levine*, 555 U.S. 555 (2009), but *Wyeth* did not involve a situation like this one, where FDA promulgated a specific regulation to govern a particular class of warnings. Indeed, in his concurrence, Justice Breyer distinguished between *Wyeth* and cases like this by emphasizing the Court's statement that "we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law." 555 U.S. at 581. Justice Breyer noted that FDA is empowered to "determine whether and when state tort law acts as a help or a hindrance to achieving [ ] safe drug-related medical care" and "may seek to embody those determinations in lawful specific regulations describing, for example, when labeling requirements serve as a ceiling as well as a floor." *Id*. at 582.

The Pregnancy Warning Regulation is precisely the sort of "lawful specific regulation[ ]" that establishes "a ceiling as well as a floor" and thus has "pre-emptive

effect." *Id*. The general warning must be included unless FDA has approved a specific warning for the product, in which case, unless FDA directs otherwise, the specific warning takes the general warning's place. State-law duties to add *unapproved* warnings to *supplement* the general warning—rather than *approved* warnings to *replace* it—are incompatible with federal law and thus preempted.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

November 7, 2024

Respectfully submitted,

/s/ Jeffrey S. Bucholtz
Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Suite 900
Washington, DC 20006
(202) 737-0500

*Attorney for Defendants-Appellees*
*Walmart Inc. and Sam's West, Inc.*

/s/ Kristen L. Richer
Kristen L. Richer
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3896

*Attorney for Defendants-Appellees*
*CVS Pharmacy, Inc., Walgreen*
*Co., and Costco Wholesale*
*Corporation*

/s/ Deanne E. Maynard
Deanne E. Maynard
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740

*Attorney for Defendant-Appellee*
*Target Corporation*

/s/ Jay P. Lefkowitz
Jay P. Lefkowitz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4970

*Attorney for Defendant-Appellee*
*Johnson & Johnson Consumer Inc.*

/s/ Lori B. Leskin
Lori B. Leskin
ARNOLD & PORTER KAYE
SCHOLER LLP
250 W. 55th Street
New York, NY 10019
(212) 836-8000

*Attorney for Defendants-Appellees*
*7-Eleven, Inc., Dollar Tree Stores, Inc.,*
*and Family Dollar Stores, LLC*

/s/ Anne A. Gruner
Anne A. Gruner
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1165

*Attorney for Defendant-Appellee*
*Dolgencorp, LLC*

<u>/s/ Amanda Groves</u>
Amanda Groves
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
(213) 615-1700

*Attorney for Defendants-Appellees Safeway, Inc., and Albertsons Companies, Inc.*

<u>/s/ Joseph A. Lara</u>
Joseph A. Lara
Stone | Dean LLP
21052 Oxnard Street
Woodland Hills, CA 91367
(818) 595-7735

*Attorney for Defendant-Appellee The Kroger Company*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,256 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point font Times New Roman.

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz

*Attorney For Defendant-Appellee*
*Johnson & Johnson Consumer Inc.*

November 7, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on November 7, 2024, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz

*Attorney For Defendant-Appellee*
*Johnson & Johnson Consumer Inc.*