# 24-916(L)

## 24-1121(CON), 24-2360(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

TIFFANY RUTLEDGE, INDIVIDUALLY AND AS MOTHER,
GENERAL GUARDIAN OF, ET AL., KRISTOPHER WHITE,
BRIDGET MCCONNELL, ALEXANDER HOLLAND, CHRISTINE HOLLAND,

*Plaintiffs-Appellants*

—against—

WALGREEN CO., COSTCO WHOLESALE CORPORATION, CVS HEALTH
CORPORATION, CVS PHARMACY, INC., SAFEWAY, INC., WALMART INC., A
DELAWARE CORPORATION, RITE AID CORPORATION, FAMILY DOLLAR, INC.,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

ASHLEY C. KELLER
ASHLEY L.F. BARRIERE
KELLER POSTMAN LLC
150 N. Riverside Plaza
  Suite 4100
Chicago, IL 60606
(312) 741-5222

JOHN J. SNIDOW
ROSEANN R. ROMANO
KELLER POSTMAN LLC
1101 Connecticut Avenue NW
  Suite 1100
Washington, DC 20036
(202) 378-0649

*Attorneys for Plaintiffs-Appellants Tiffany Rutledge, et al., Kristopher White,
Bridget McConnell, Alexander Holland, and Christine Holland*

TARGET CORPORATION, SAM'S WEST, INC., DOLLAR TREE, INC., 7-ELEVEN, INC., FAMILY DOLLAR STORES, INC., THE KROGER CO., DOLLAR TREE STORES, INC., JOHNSON & JOHNSON CONSUMER INC., BIG LOTS, GIANT FOOD LLC, ALBERTSON'S, HARRIS TEETER LLC,

*Defendants-Appellees.*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................ iii

Introduction ...................................................................... 1

Argument ......................................................................... 6

I.  Defendants Cannot Dispute Plaintiffs' Interpretation Of Rule 702. ...... 6

II.  The District Court Erred By Excluding The Experts For Evaluating ASD And ADHD Together. .................................................... 7

III.  Dr. Baccarelli Reliably Applied Each Bradford Hill Factor. ............ 12

    A.  Consistency ........................................................... 12

    B.  Strength .............................................................. 13

    C.  Genetic Confounding .................................................. 14

    D.  Dose Response ........................................................ 15

    E.  Temporality .......................................................... 16

    F.  Biological Plausibility .............................................. 17

    G.  Analogy .............................................................. 18

IV.  The District Court Erred By Rejecting Dr. Baccarelli's Navigation Guide Analysis. ........................................................... 18

V.  The Experts Did Not Cherry-Pick The Literature ........................ 19

VI.  The District Court Erred By Excluding Dr. Cabrera .................... 21

VII.  The District Court Erred By Excluding Dr. Pearson .................... 23

VIII.  The District Court Erred By Excluding Dr. Louie. ................... 24

IX.  Plaintiffs' Claims Are Not Preempted. ................................ 24

    A.  The General Pregnancy Warning Does Not Preempt Plaintiffs' Claims. ................................................... 25

    B.  21 C.F.R. § 330.1(c)(2) Does Not Prohibit Additional Pregnancy Warnings. ................................................... 26

i

C.  FDA Did Not Interpret § 201.63 To Forbid Additional
    Pregnancy Warnings, And *Auer* Deference Does Not Apply. .........29

D.  Policy Concerns Are Irrelevant And Weigh Against
    Preemption ...........................................................................................30

Conclusion ....................................................................................................31

Certificate of Compliance ............................................................................32

Certificate of Service ...................................................................................33

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ...............................................................3

*Daniels-Feasel v. Forest Pharms., Inc.*,
  No. 17-CV-4188-LTS-JLC, 2021 WL 4037820 (S.D.N.Y. Sept. 3,
  2021) ...............................................................................................9, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...........................................................................7

*Elosu v. Middlefork Ranch Inc.*,
  26 F.4th 1017 (9th Cir. 2022) ..................................2, 3, 12, 13, 15, 17

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)...........................................................................29

*Isett v. Aetna Life Ins. Co.*,
  947 F.3d 122 (2d Cir. 2020) ..........................................................25, 26

*In re Joint Eastern E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir. 1995) .............................................................3

*Kisor v. Wilkie*,
  588 U.S. 558 (2019)........................................................................29, 30

*Kuhn v. Wyeth, Inc.*,
  686 F.3d 618 (8th Cir. 2012) .........................................................20, 21

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...........................................................................2

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011).........................................................1, 3, 15

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
  982 F.3d 113 (2d Cir. 2020) ............................................................16

iii

*In re TransCare Corp.*,
    81 F.4th 37 (2d Cir. 2023) .................................................................21, 22

*United States v. Quiroz*,
    22 F.3d 489 (2d Cir. 1994) ......................................................................18

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ......................................................................5

*Wyeth v. Levine*,
    555 U.S. 555 (2009).......................................................................26, 30, 31

*Zervos v. Verizon, N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) ......................................................................5

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) ....................................................................21

## Other Authorities

21 C.F.R. § 201.63 ................................................5, 6, 24, 25, 29, 30

21 C.F.R. § 201.66 ........................................................................28

21 C.F.R. § 330.1(c)(2) ........................................6, 25, 26, 27, 28

Acetaminophen Monograph, 53 Fed. Reg. 46,204 (Nov. 16, 1988) ................25, 27

FDA, *Guidance for Industry: Recommended Warning for Over-the-Counter Acetaminophen-Containing Drug Products and Labeling Statements Regarding Serious Skin Reactions* (Jan. 2017) ................27

Fed. R. Evid 702 ................................................2, 4, 5, 7, 8, 12

John P. Jones III et al., *Evaluating the Role of Susceptibility Inducing Cofactors and of Acetaminophen in the Etiology of Autism Spectrum Disorder*, 14 Life 1 (2024) ................................................2

Labeling of Drug Products for Over-the-Counter Human Use, 50 Fed. Reg. 15810 (Apr. 22, 1985)................................................28

Timothy L. Lash et al., *Modern Epidemiology* 675 (4th ed. 2021)........................14

iv

Over-The-Counter Human Drugs; Labeling Requirements, 64 Fed.
Reg. 13254 (Mar. 17, 1999)............................................................28, 29

Pregnant or Nursing Women; Delegations of Authority and
Organization; Amendment of Labeling Requirements for Over-the-
County Human Drugs, 47 Fed. Reg. 54750 (Dec. 3, 1982) ...............................29

Noah J. Spillers et al., *Prenatal Acetaminophen Exposure and Its
Associated Risk for Attention Deficit Hyperactivity Disorder*, 12
Health Psych. Rsch. 1 (2024) ............................................................2

U.S. Const. art. VI, cl. 2 ............................................................30

v

# INTRODUCTION

Plaintiffs' position rests on a simple proposition: scientific methods are reliable as a matter of law if they mirror methods scientists use outside of court. The District Court turned that rule upside down. Over and again, it announced—without a single, solitary scientific reference—methodological requirements "of the district court's [own] making," and then excluded Plaintiffs' experts for failing to apply those judicially crafted rules. *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011) (citation omitted).

Remarkably, Defendants do not disagree. They do not dispute that the District Court repeatedly announced and applied scientific "rules" without citing a single scientific source. They similarly do not contest that numerous scientists outside of court practice their scientific methods in the *exact same way* as Plaintiffs' experts. Those undisputed points can lead only to reversal.

Rather than engage with Plaintiffs' position, Defendants begin by demolishing a strawman. They say that an expert's opinion is not "necessarily reliable" simply because he "can cite mere sentences or incomplete data from peer-reviewed literature that appear to support his opinion." Defs.Br.3. Plaintiffs agree. They do not claim that their experts applied reliable methods merely because so much of the

1

peer-reviewed literature supports their conclusions.[1] They argue instead that the District Court erred because published scientists routinely apply the same *methodologies* in the exact same way when examining this very scientific question and in analogous contexts. When an expert applies a methodology the same way that his peers do, he is (by definition) not outside "the range where experts might reasonably differ"; he is (by definition) employing "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999). He is therefore (by definition) offering a "reliable application" of his methods and principles. Fed. R. Evid. 702(d).

Defendants do not grapple with Plaintiffs' actual argument. Nor do they explain how a district court could possibly exclude an expert for doing what his publishing peers do without violating key Rule 702 principles—specifically,

---

[1] Plaintiffs catalog the numerous scientists who have published papers stating that acetaminophen likely causes ASD and ADHD. Pls.Br.1-2, 11-12. Since the District Court's opinion, this literature has continued to accumulate: a systematic review stated that "there is enough evidence of the association [between acetaminophen and ADHD] to counsel pregnant patients of the proposed risk of taking the medication." Noah J. Spillers et al., *Prenatal Acetaminophen Exposure and Its Associated Risk for Attention Deficit Hyperactivity Disorder*, 12 Health Psych. Rsch. 1, 2 (2024). Another peer-reviewed article concluded that there is "no reasonable doubt" based on "overwhelming" evidence, that "acetaminophen exposure cause[s] many if not most cases of ASD." John P. Jones III et al., *Evaluating the Role of Susceptibility Inducing Cofactors and of Acetaminophen in the Etiology of Autism Spectrum Disorder*, 14 Life 1, 1, 4 (2024). These and countless other statements are not "mere sentences" drawn from "incomplete data." They are the out-of-court, bottom-line conclusions of peer-reviewed scientists.

2

declaring a winner "by judicial fiat" in a "battle of the experts," *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022) (citation omitted), "determin[ing] which of several competing scientific theories has the best provenance," *Milward*, 639 F.3d at 15 (citation omitted), "assess[ing] the weight of conflicting evidence," *In re Joint Eastern E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1133 (2d Cir. 1995) (alteration in original) (citation omitted), playing "amateur scientist," *id.*, or putting on the "white lab coat," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002) (citation omitted).

After attacking an argument Plaintiffs did not make, Defendants champion an opinion the District Court did not write. The District Court said it excluded the experts because they departed from specified (and invented) methodological rules. Now that Plaintiffs have proven that scientists routinely apply their methods and principles in the exact same way, Defendants invent (for the first time on appeal) another deficiency: the experts failed to adequately "support" their methodological decisions. Defs.Br.26-32. For instance, Defendants now grudgingly concede that epidemiologists routinely perform a combined Bradford Hill analysis for distinct but related conditions, but say Plaintiffs' experts did not "support" their decision to do so here. *Id.* at 31.

This lawyer-introduced "more-support" requirement fails for the same reasons as the District Court's actual decision: it imposes a "rule" that finds no refuge

in the peer-reviewed literature. The numerous cited studies conducting a multiple-conditions causation analysis did *not* support their decisions to consider related conditions together. Pls.Br.30-31. The published scientists who conducted causal analyses on the link between acetaminophen ("APAP") and neurodevelopmental disorders—the very question at issue—similarly did not offer the "support" Defendants insist is the hallmark of reliability. And the reason underscores the District Court's error. Epidemiologists see no reason to "support" the methodologies applied by Plaintiffs' experts for the same reason they would not include a defense of regression analysis in their studies: these methods are widely accepted and foundational to the field. Like the District Court, Defendants are inventing a rule that may have some intuitive appeal to *lawyers* and decreeing that *scientists* who do not follow that rule are unreliable. The peer reviewed literature says otherwise. So, therefore, does Rule 702.

In a revealing concession, Defendants audaciously claim that if peer-reviewed scientists have done exactly what Plaintiffs' experts did, *those scientists too* are not employing reliable methods. Defs.Br.31-32 (discussing the Alemany study). Said differently, the District Court got the scientific methods right; peer-review boards composed of actual scientists got it wrong. This argument at least has the virtue of accurately describing the District Court's approach. But that intellectual honesty

4

comes at the price of proving Plaintiffs' point: the District Court exercised power it does not possess.

The District Court's rewrite of what counts as reliable scientific methods pervades its opinion. That aside, Defendants claim the judgment can stand based on the District Court's allegations of "cherry-picking." The charges do not withstand even the slightest scrutiny. The experts' actual reports grapple with every issue in great detail. After spending the bulk of its opinion inventing methodological requirements to justify its preferred result, the District Court simply ignored the experts' extensive analyses to bolster its flawed conclusion.

Defendants fall back on the abuse-of-discretion standard, but discretion is "not unfettered," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), and this Court decides what Rule 702 means *de novo*, *Zervos v. Verizon, N.Y, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). As a matter of law, Rule 702 bars judges from faulting an expert for practicing his methods in the same way as peer-reviewed scientists. Any other interpretation of the Rule *requires* judges to make scientific judgments that they are untrained to make. The District Court (and Defendants' counsel) do not know how to practice epidemiology better than the Dean of the Harvard School of Public Health.

Finally, Defendants' makeweight preemption argument fails. The plain text of the general pregnancy warning, 21 C.F.R. § 201.63, does not prohibit additional

pregnancy warnings. Similarly, 21 C.F.R. § 330.1(c)(2) does not pertain to additional warnings. And FDA did not interpret 21 C.F.R. § 201.63 to prohibit additional pregnancy warnings, nor would any such (nonexistent) interpretation have the force of law or be entitled to deference. Defendants could have simultaneously complied with state failure-to-warn laws and federal law, defeating their preemption defense.

## ARGUMENT

### I. Defendants Cannot Dispute Plaintiffs' Interpretation Of Rule 702.

The District Court provided "*zero* scientific authorities" in support of its judicially crafted scientific methods. Pls.Br.29. By contrast, Plaintiffs provided numerous examples where independent scientists did exactly what the experts did here and were published after a peer-review process approved of their methods. *Id.* It cannot be an "unreliable application" of scientific methods to mirror what independent scientists do outside of court. SPA-167.

Defendants mischaracterize that argument rather than rebut it. In their telling, Plaintiffs' rule is that "if an expert can identify a single peer-reviewed study that can be read (even partially) to support his opinion, his testimony is *ipso facto* reliable and admissible under Rule 702." Defs.Br.33.[2] Not so. It is surely an indicium of

---

[2] Defendants also mischaracterize this position as asking for a license to cherry-pick. Defs.Br.33. This is another caricature. Plaintiffs' actual position is that experts can

6

reliability that independent scientists support an expert's ultimate conclusion. But Plaintiffs—like Rule 702 and the case law interpreting it—are focused on methods and principles. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). It should not be controversial that (i) non-scientist jurists cannot *make up* scientific principles, and (ii) the best evidence that the District Court's principles are made up is that it (and Defendants) offers *no citations* to support them while Plaintiffs have cited *numerous* sources showing actual scientists do not follow them. Those premises are undisputed.

## II. The District Court Erred By Excluding The Experts For Evaluating ASD And ADHD Together.

Defendants agree that the District Court excluded Drs. Baccarelli and Cabrera primarily because they did not "conduct[] separate" Bradford Hill analyses for ASD and ADHD. Defs.Br.26.[3] That ground for exclusion is permissible only if conducting a combined analysis for ASD and ADHD is, in fact, an "unreliable application" of the Bradford Hill methodology. Fed. R. Evid. 702(d).

---

favor some results over others so long as their choices are grounded in the same approach that independent scientists deploy.

[3] The District Court referred to this as a "transdiagnostic approach." This phrase never appears in Drs. Baccarelli or Cabrera's reports, as Defendants implicitly acknowledge. Defs.Br.26 n.18. Regardless, a reliable method does not become unreliable based on terminology.

Is it?  Like the District Court, Defendants provide *zero* citations from *any* scientific authority forbidding an expert from conducting a combined Bradford Hill analysis on two related conditions.[4]  That is no surprise.  As Plaintiffs' brief demonstrated, publishing scientists conduct Bradford Hill analyses on multiple related conditions *all the time* for sets of conditions ranging from the relatively narrow ("oral cancer," which includes cancers of the tongue, throat, mouth, etc.; and "irritable bowel syndrome," which includes both ulcerative colitis and Crohn's Disease) to the extraordinarily broad ("idiopathic environmental intolerance" and "health" writ large).  Pls.Br.30-31.  None of this means that these published scientists are right about whatever *conclusions* they drew.  But it proves that the *methodology* of analyzing related conditions together is reliable according to the people Rule 702 says should count: actual scientists.[5]

---

[4] The closest the District Court came was its statement that a separate Bradford Hill analysis would make "the reliability of any such expert analysis … more easily assessed by other experts and ultimately by a court conducting a Rule 702 inquiry." SPA-63.  No scientific authority requires this.

[5] In the end, the District Court's objection effectively comes down to formatting, because Dr. Baccarelli *separately* discussed the studies on ADHD, A-1821, before *separately* discussing the studies on ASD, A-1839.  And he made clear that he had "performed a Bradford-Hill assessment separately for ASD [and] ADHD" and "reach[ed] the same conclusion."  A-1912.  The only thing he did not do was repetitively detail each Bradford Hill factor for the two conditions.  The same is true for Dr. Cabrera.  A-2284-322, A-2332-79.

Defendants have no real response. So they first try to sidestep the District Court's actual opinion, arguing that "the District Court never suggested that transdiagnostic approaches to causation are categorically unreliable." Defs.Br.30-31. The District Court suggested precisely that when it quoted *Daniels-Feasel* for the proposition that Bradford Hill is about "assign[ing] causality to *an* association." SPA-62 (emphasis added by District Court). The emphasis was obviously made to suggest that *only one* association can be evaluated at a time. That is what led the District Court to conclude that "[i]t is not clear … that conducting a Bradford Hill analysis on multiple associations at once is informative or reliable." SPA-62.[6] It borders on the absurd to suggest that a prior judicial opinion's use of the indefinite article "an" somehow defines the proper scientific methodology. Regardless, conducting a Bradford Hill analysis on multiple associations at once is routine in the scientific community.

Defendants' fallback position is that while a combined Bradford Hill analysis might *sometimes* be reliable, it cannot be here, because ASD and ADHD have different "diagnostic criteria." Defs.Br.27. Like the District Court, Defendants

---

[6] The District Court's statements at oral argument confirm this reading. A-5371 (Tr.6:14-15) ("ASD and ADHD are separate disorders, but the plaintiffs' experts did not conduct a separate Bradford Hill examination for the two disorders."); A-5384 (Tr.19:3-6) ("One issue for me is …whether Bradford Hill analysis can be applied here, survive admissibility review, when it's not focused separately on autism and ADHD."); A-5406 (Tr.41:20-21) ("I'm sorry. Am I supposed to create an expert report running a Bradford Hill analysis on ADHD [alone]?").

9

supply *no citation* for this ASD/ADHD-specific rule. Nor could they, because the same lawyer-driven criticism would apply to every example Plaintiffs identified. Crohn's Disease and ulcerative colitis; throat cancer and tongue cancer; the various conditions that make up "mental health"—*all* have different "diagnostic criteria," and a diagnosis of one "does not entail the same [thing] as" a diagnosis of the other. *Id.* But that has not stopped actual scientists from reliably grouping these (and many other) related conditions together for purposes of a causation analysis.

If there were any doubt on this point, the Alemany study resolves it. Defendants argue that Plaintiffs' examples of combined Bradford Hill analyses "have nothing to do with ASD and ADHD," Defs.Br.30, but Alemany is a study about the link between APAP, ASD, and ADHD. And those study authors evaluated the Bradford Hill criteria for ASD and ADHD together.[7] There is no getting around this fact: Peer-reviewed studies have done *precisely* what the District Court said these experts must be *excluded* for doing.

---

[7] Bizarrely, Defendants claim that the Alemany study does not "even claim to have conducted" a Bradford Hill analysis. Defs.Br.31. In reality, the authors cite the Bradford Hill address directly, then go on to discuss the "causal criteria" that a Bradford Hill analysis entails. A-4467, A-4470 n.42. Defendants also protest that Alemany never made a "caus[al]" *conclusion*, Defs.Br.31, but that misses the point. The District Court identified a supposedly unreliable *methodology*. Alemany conclusively rebuts that *methodological* point.

10

The District Court brushed this devastating counterexample aside by stating that Alemany "cit[ed] to other research" rather than "conduct[ing] its own Bradford Hill analysis." SPA-70. Not even Defendants defend that confused rationale here.[8] Instead, they criticize the Alemany authors *themselves* for not "clearly differentiating between evidence pertaining to ASD and ADHD" and not providing "any justification for conducting a shared causation analysis for ASD and ADHD." Defs.Br.31. On Defendants' telling, the Alemany scientists (and the peer reviewers who approved of their methodology) did it wrong. But none of the cited, published Bradford Hill analyses include "any justification for conducting a shared causation analysis." Defs.Br.31; *see* Pls.Br.30-31 (citing relevant literature). Defendants' insistence that experts do more in the courtroom than they do in the scientific field is anathema to Rule 702.

The epidemiologist *amici*, who are titans in the field, get the same treatment.[9] Although these *scientists* stated that "a joint Bradford Hill analysis of ASD and ADHD outcomes would be an accepted practice," Dkt.134.1 at 4, Defendants insist

---

[8] In reality, *every* Bradford Hill analysis *necessarily* proceeds by "citing to other research." After all, a Bradford Hill analysis is not like a laboratory test that produces original results. It is a methodology for drawing a causal inference from the totality of "other research."

[9] The epidemiologist *amici* are all Harvard-educated scientists who study important public health issues, such as the influence of environmental exposures on brain health (Dr. Weisskopf), preventable causes of chronic disease (Dr. Colditz), and medication and vaccine safety (Dr. Young-Xu).

11

that the District Court is right, and the *amici* are wrong. Defs.Br.32 n.20. At bottom, Defendants are not even asking this Court to (improperly) pick the winner in a "battle of the experts." *Elosu*, 26 F. 4th at 1026. They are asking it to side with lawyers over scientists on questions of sound scientific practice. That is impermissible under Rule 702.

## III. Dr. Baccarelli Reliably Applied Each Bradford Hill Factor.

### A. Consistency

The District Court held that Dr. Baccarelli's consistency opinion was based on "*ipse dixit*"—his own say so—alone. SPA-81. But as Plaintiffs pointed out in their opening brief, Dr. Baccarelli cited at least four sets of published authors who found a consistent association for similar reasons. Pls.Br.34.[10] An expert is not relying merely on his own "say so" when *he cites* independent scientists who "say so" in the published literature.

Defendants reassert the District Court's reasoning: Because not *every* subset of results from *every* study showed an association, Dr. Baccarelli could not reliably find the consistency factor satisfied. Defs.Br.36-37. There is no citation to scientific

---

[10] Defendants characterize these studies as merely providing "a few quotes from scientific articles that seem to support" Dr. Baccarelli's position on consistency. Defs.Br.36. Far from it. They agree with him on the precise point that the District Court said rendered his entire opinion scientifically unreasonable.

authority for the notion that *every* single sub-group result must be supportive before the consistency criterion can be satisfied. *Cf.* A-4650.

This, again, is a rule of the District Court's own making—pure "judicial fiat." *Elosu*, 26 F.4th at 1026. Dr. Baccarelli's report noted that there are dozens of studies showing the association—by different persons, in different places, etc.—which is enough for consistency to be found. Pls.Br.33 (citing A-4683). That is why so many independent scientists have said the same thing.[11] The District Court erred by creating an idiosyncratic definition of consistency—perfect uniformity in all results—and then excluding experts for failing to satisfy it.

## B. Strength

Dr. Baccarelli said that the strength of the association was "moderate," and on that point, the Ricci authors agree, or at least show that his analysis was not unreasonable. A-4456. But according to the District Court, an expert may not find strength based on a "moderate" association, *i.e.*, when the relevant "risk ratios [are] between 1.0 and 2.0." SPA-83.

The District Court's judicially imposed rule flatly contradicts the well-established scientific rules of epidemiology. As the leading epidemiology textbook

---

[11] Confronted with this reality, Defendants argue yet again that the District Court is right and the scientists are wrong. Defs.Br.37 n.22. What qualifies lawyers or this Court to make that scientific assessment Defendants do not say.

13

says, there is "no general rule for how large an association needs to be to meet [the strength] consideration." A-4648. That is, among actual scientists, there is *no rule* like the one the District Court invented.

Defendants also claim that Dr. Baccarelli's conclusion was improperly "bolster[ed]" by "speculat[ion]" that "the studies' reliance on maternal self-reports of acetaminophen use biased the results downward." Defs.Br.38. But again, the actual scientific literature is on Dr. Baccarelli's side: Any error in self-reported exposure data "is expected to be non-differential and bias results *towards the null*," *i.e.*, downward. A-1806 (emphasis added); Timothy L. Lash et al., *Modern Epidemiology* 675 (4th ed. 2021) ("[B]ias toward the null value results from nondifferential misclassification.").

### C. Genetic Confounding

Dr. Baccarelli spent 22 pages explaining why he did not believe this association was due to genetic confounding. A-1854-66, A-2875-85. This despite his repeated acknowledgement that, as with so many conditions, genetics plays a role in the etiology of ASD and ADHD. A-1781, A-1784. Ignoring this analysis, the District Court claimed that Dr. Baccarelli "refused to acknowledge the role of genetics in … either ASD or ADHD." SPA-62. Defendants cannot defend the District Court's assertion because it is demonstrably false. Giving away the game,

14

they instead resort to arguing their side of the scientific debate, asserting that genetic confounding is at work. Defs.Br.40-41.

Defendants' experts are entitled to that opinion. But there is a dispositive difference between refusing to grapple with a key issue—which can be methodologically unreliable—and grappling with it extensively in support of a conclusion the District Court (and Defendants) do not prefer. *Elosu*, 26 F.4th at 1026. As Defendants' own epidemiologist admitted, there is currently an "ongoing debate" among scientists about whether this association is causal or due to genetic confounding. A-4003 (Tr.138:18-19). A district court may not take sides in that "scientific … debate." *Milward*, 639 F.3d at 22. And numerous independent scientists agree that genetics "do not explain the association observed for acetaminophen exposure." A-1389; *see also* A-4535; Pls.Br.10 (collecting examples).

### D. Dose Response

The District Court invented another scientific rule: reliably analyzing dose response requires "actual doses" measured in milligrams of APAP. SPA-90. Defendants do not and cannot dispute that the District Court cited *nothing* in support. Defendants' brief cites nothing, either. Meanwhile, actual scientists studying *this very question* measured doses of APAP in exactly the same way as Dr. Baccarelli *and* reached the same dose-response conclusion. Pls.Br.39-40.

15

So how can Defendants say that Dr. Baccarelli unreliably analyzed dose response? By again claiming that the scientists outside of court are wrong. Like Dr. Baccarelli, these practicing scientists failed "to grappl[e] with this issue" of quantitative dose measurements, Defendants argue, thereby dooming their analysis.[12] Defs.Br.43. A district court has latitude to determine "what method is appropriate for evaluating reliability," *id.* at 42 (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 122 (2d Cir. 2020)), but making up scientific rules is neither a method for evaluation nor appropriate. That is especially so where the judge-made rule is at odds with the way actual scientists have been evaluating dose response for decades.

### E. Temporality

The temporality factor is satisfied unless "we know that [cause] *X* never occurred before [disease] *Y* in studies showing an association between *X* and *Y*." A-4652. There is no evidence of that here. On that basis, Dr. Baccarelli determined that the temporality criterion was satisfied, just like the peer-reviewed Alemany study. A-4467 ("Temporality [for the APAP-ASD/ADHD relationship] is supported

---

[12] Defendants even side with the District Court over their *own* expert who published a paper stating that there is "a dose-response relationship" here. A-4772. Defendants now suggest that he was "simply reporting what another study had stated," and that those scientists were doing it wrong as well. Defs.Br.43 n.25.

16

because the exposure precedes the onset of the symptoms assessed."); *see also* Pls.Br.38-39.

The District Court's contrary conclusion once again rested on a judge-made rule supported by no scientific authorities. SPA-88. Instead of defending the District Court's made-up rule, Defendants simply repeat it: temporality is not satisfied because "it is currently unknown when the neurological underpinnings of ASD and ADHD develop in the fetal brain." Defs.Br.43. Such knowledge has never been required to satisfy this factor, as innumerable scientific authorities hold, including for *this very association*. A-4467; Pls.Br.38-39. The District Court's temporality holding is based on "judicial fiat" alone. *Elosu*, 26 F.4th at 1026.

## F. Biological Plausibility

Defendants argue that "the ultimate admissibility of Dr. Baccarelli's causation opinion" did not turn on his supposedly unreliable assessment of this factor. Defs.Br.43. That is no defense of the District Court's holding that Dr. Baccarelli's biological-plausibility opinion failed "to reflect a reliable application of scientific principles." SPA-92. And the reason it provided—that this criterion is satisfied only when "the precise physiological … processes" by which a disease develops is known with certainty—is demonstrably untrue. SPA-91; Pls.Br.42-43 (collecting cases and

scientific authorities).[13]  The District Court's approach on this factor was consistent with its overall approach to the Rule 702 inquiry.  If, as Defendants all but concede, the District Court erred on biological plausibility, it similarly erred in assessing every other Bradford Hill factor.

### G. Analogy

Defendants can only muster a single sentence on this factor, stating that the District Court "reasonably" determined analogy is not satisfied unless an expert discusses the "chemical structure" of the molecule. Defs.Br.44. That is not an answer, and Defendants have forfeited this point. *Cf. United States v. Quiroz*, 22 F.3d 489, 490–491 (2d Cir. 1994) ("[A]n argument not raised on appeal is abandoned."). Forfeiture or not, there is simply no scientific authority requiring discussion of "chemical structure" when evaluating the analogy factor.

### IV.  The District Court Erred By Rejecting Dr. Baccarelli's Navigation Guide Analysis.

Dr. Baccarelli also evaluated causation using the Navigation Guide methodology.  The District Court held that this was unreliable because "[t]he Navigation Guide is not designed to distinguish a causal association from a mere association." SPA-68.  Defendants repeat that point here.  Defs.Br.44.  But Plaintiffs

---

[13] That is why the Alemany authors were able to conclude that the biological-plausibility factor was satisfied *for the association between APAP, ASD, and ADHD* even though the "precise physiological processes" remain unknown. A-4467.

identified multiple examples of scientists who have used the Navigation Guide to assess causation. Pls.Br.44. Defendants assert that "none of the cited studies actually used the Navigation Guide" methodology to evaluate causation, Defs.Br.44, but a mere glance at what the study authors said disproves that false assertion. A-4716 (using the Navigation Guide to state that no "causal relationship" could be established); A-4724 (similar); A-4745 (similar). It is a fact: independent scientists use the Navigation Guide as a reliable method to assess causation. The District Court's contrary holding is obvious error.

## V. The Experts Did Not Cherry-Pick The Literature.

Defendants claim that Plaintiffs think "experts should be *permitted* to cherry-pick[.]" Defs.Br.33. That is false. Cherry-picking occurs when a scientist only evaluates favorable evidence "from the scientific landscape" and "fails to address" evidence that could cut the other way. *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17-CV-4188-LTS-JLC, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) (citation omitted), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023). Plaintiffs do not support that practice. But there is a vast difference between *ignoring* unsupportive evidence and deciding that, after careful analysis, it does not outweigh the supportive evidence. The latter is what happened here.

The District Court accused Dr. Baccarelli of "cherry-picking" based on his assessment of two sibling-control studies: Brandlistuen (which found a statistically

significant association) and Gustavson (which did not). SPA-98-99. But Dr. Baccarelli did not focus only on Brandlistuen and "fail[] to address" Gustavson. He explained his treatment of both studies at length, A-1828, A-1847; he explained why all sibling-control studies understate the true risk, A-1863-64, A-2879; and he explained why *both* results were consistent with his ultimate opinion, A-1859-60, A-2880-81. That is not cherry picking—it is evidence of a reliable application of a scientific method.

Dr. Cabrera's analysis of adult rodent studies is similarly miscast as "cherry-picking." SPA-119-20. Because all the studies involved adult rodents, the District Court said, Dr. Cabrera must have been "cherry-picking" when he gave more weight to the studies showing a harmful effect. *Id.* Once again, however, Dr. Cabrera did not "fail to consider" the studies that showed no harmful effects. He grappled with them extensively, explaining why some were poorly designed, and why his opinion was rooted in the totality of the available evidence. A-2330; *see also* A-2288-89.

As these two examples make clear, when the District Court used the term "cherry-picking," it was shorthand for not assigning sufficient weight to the *right* evidence from the *District Court's* perspective. But Plaintiffs' experts cannot be excluded as unreliable for reaching a conclusion, after evaluating *all* of the evidence, simply because the District Court disagrees. *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633

20

(8th Cir. 2012) ("[I]t is not the province of the court to choose between the competing theories when both are supported by reliable scientific evidence.").

## VI.   The District Court Erred By Excluding Dr. Cabrera.

Defendants never argued below that Dr. Cabrera should be excluded because he "did not explain how he weighed the various Bradford Hill criteria." Defs.Br.45. On appeal, Defendants do not dispute the point.  Just as the District Court should have limited itself to "questions presented by the parties," *In re TransCare Corp.*, 81 F.4th 37, 58 (2d Cir. 2023), this Court should take Defendants' marked silence as a concession that the District Court violated the party-presentation rule.

Waiver aside, the District Court's analysis is meritless.  Actual scientists conduct Bradford Hill analyses without explaining their "weighting."  Pls.Br.51. Even Sir Bradford Hill himself said nothing at all about needing to use formal weights.  Once again, the District Court excluded an expert for violating a made-up "rule" of science.[14]

The District Court also decided that Dr. Cabrera had not conducted his Bradford Hill analysis in the way it is supposed to be done.  With respect to

---

[14] Defendants quote *In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation*, for the proposition that "there must be a scientific method of weighting that is used and explained."  858 F.3d 787, 796 (3d Cir. 2017) (citation omitted). That too is not a case they cited for this proposition below, and an out-of-circuit judicial decision is no substitute for the work of practicing scientists.

21

consistency, Dr. Cabrera's "five paragraphs" of analysis, SPA-111, was apparently not long enough, though no scientific authority imposes a word-count floor.[15] Defendants argue harmless error, claiming that the exclusion was not "simply because [the analysis] was short." Defs.Br.46. But Defendants' conjured alternative ground—that literature is inconsistent when it is "heterogenous," whatever that means—is simply citation-free attorney argument on what counts as a reliable application of science.

On strength of association, the District Court again leveled a (baseless) criticism that Defendants did not raise below, namely that Dr. Cabrera "conflat[ed] … dose-response and strength." SPA-111. Defendants again do not dispute the District Court's disregard for the party-presentation rule. This Court should therefore accept the point and reverse the error. *See In re TransCare Corp.*, 81 F.4th at 58.

With respect to biological plausibility, the District Court faulted Dr. Cabrera for failing to satisfy the same, manufactured biological plausibility requirement that even Defendants do not defend. *See supra* at 17. Dr. Cabrera opined, in reliance on Adverse Outcome Pathway ("AOP") 20, that APAP can plausibly lead to oxidative stress. As "amateur scientist," the District Court found this opinion unreliable

---

[15] This superficial dismissal also ignores Dr. Cabrera's 95-page detailed analysis of the ASD, ADHD, and NDD literature. A-2284-322, A-2332-79.

because AOP 20 is limited to mercury. SPA-115. Defendants know the District Court got that wrong, so they run from its actual opinion. Instead, they contend for the first time (*ever*) that AOP 20's mention of APAP is limited to oxidative stress for liver toxicity. Defs.Br.48. But that is wrong too. APAP is listed in AOP 20 as a "Stressor" for "AOP 17," which describes "oxidative stress" "[that] leads to impairment of learning and memory."[16] A-5187. Defendants' brand-new argument underscores both the dangers of departing from the party-presentation rule and permitting litigants to raise new, highly factual scientific arguments for the first time on appeal.

## VII.  The District Court Erred By Excluding Dr. Pearson.

Dr. Pearson cited independent scientific authority to ground his decision to weight studies that showed neurodevelopmental disruption in either "direction" in his causation analysis. Pls.Br.59. It cannot be mere "*ipse dixit*" for an expert to cite scientific authority in support of his opinions. SPA-140. In response, Defendants simply dispute what the cited authority says, claiming it "do[es] not remotely support the view that a behavioral change in one direction can support causation in the

---

[16] Below, Defendants argued AOP 20 was irrelevant because it specified that oxidative stress can "lead to functional impairment in learning and memory" but did not specify ASD and ADHD. *See* MDL Dkt.1165 at 7, 27–28. Defendants have abandoned that misguided argument in favor of simply ignoring the text of the document.

opposite direction." Defs.Br.49. But that is *exactly* what the authority says: "*Neurotoxic adverse effects* are defined as *any change* in the structure or function of the … nervous system. This includes alterations in *either* direction." A-4920 (emphases added).

## VIII. The District Court Erred By Excluding Dr. Louie.

The District Court found Dr. Louie's opinion unreliable because he did not identify a particular trimester where APAP use is particularly harmful or distinguish between sporadic or consecutive use. SPA-143. But Plaintiffs supplied a wealth of scientific authority showing that Dr. Louie's approach is reliable. Pls.Br.59-60. Defendants do not grapple with these sources, but instead simply declare that "such a blunt measure will not suffice for prenatal exposures" and that the "[t]he court reasonably determined that greater precision was necessary in the prenatal context." Defs.Br.50. But how did the District Court "reasonably" make this determination? What equips a jurist to say that the "prenatal context" requires more precision, independent scientific sources notwithstanding? Defendants' citation-free defense of the District Court's citation-free scientific rulemaking is yet another demonstration of how the decision below upends Rule 702.

## IX. Plaintiffs' Claims Are Not Preempted.

Nothing in 21 C.F.R. § 201.63 prevented Defendants from adding a warning about ASD and ADHD. That regulation requires a general pregnancy warning, and

§ 330.1(c)(2) simply requires it to be given with the "exact language" provided. But those regulations do not preclude the use of *additional* warnings, as the actual APAP labels confirm. There is no FDA interpretation to the contrary, and no regulatory action would be entitled to *Auer* deference. The naked policy arguments lodged by Defendants' *amici* have no significance under the Supremacy Clause.

### A. The General Pregnancy Warning Does Not Preempt Plaintiffs' Claims.[17]

The plain text of 21 C.F.R. § 201.63 requires a general pregnancy warning. It says nothing to forbid *additional* warnings. The provision states:

> The labeling for all over-the-counter (OTC) drug products that are intended for systemic absorption, unless specifically exempted, shall contain a general warning under the heading "Warning" (or "Warnings" if it appears with additional warning statements) as follows: "If pregnant or breast-feeding, ask a health professional before use." [first four words of this statement in bold type] In addition to the written warning, a symbol that conveys the intent of the warning may be used in labeling.

21 C.F.R. § 201.63. There is not a shred of regulatory text that forbids a manufacturer from using the required warning *and also* adding warnings required by state law. The plain text of the regulations is dispositive on their sweep. *See Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 132 (2d Cir. 2020) (declining to read in

---

[17] APAP is subject to the Acetaminophen Monograph, 53 Fed. Reg. 46,204, 46,255 (Nov. 16, 1988), as well as the general federal regulations for OTC drug labeling, including the general pregnancy warning found in 21 C.F.R. § 201.63(a).

limitations not included in a regulation's express terms). Especially in light of the presumption against preemption, Defendants cannot meet their "heavy burden" to show that it is impossible to satisfy both state and federal law. *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009).[18]

## B. 21 C.F.R. § 330.1(c)(2) Does Not Prohibit Additional Pregnancy Warnings.

Defendants' invocation of the "exact language" rule, 21 C.F.R. § 330.1(c)(2), is a non sequitur. Defs.Br.54. That rule merely requires marketers to state the general pregnancy warning verbatim. It says nothing about whether a marketer is forbidden from making an *additional* warning. In fact, the exact-language rule makes clear that it is limited to warnings "established and identified by quotation marks in an applicable OTC drug monograph or by regulation." 21 C.F.R. § 330.1(c)(2). Where a warning has not been "established" by a regulation or monograph—which the ASD/ADHD warning has not been—the marketer is free to add it with truthful, relevant language required by state law.

Defendants' own APAP labels confirm this textual point. The Tylenol label warns: "Do not use … if you are allergic to acetaminophen," but the Acetaminophen

---

[18] The District Court agreed: "The Pregnancy Warning Regulation simply does not speak to whether a further warning related to a drug's use during pregnancy can be added to the general Pregnancy Warning on a drug label." A-965; *see also* A-599-600 ("[Section 330.1] does not address the ability of manufacturers to supplement the general warning with safety warnings specific to their OTC drug.").

Monograph does not require this warning.  *See* Acetaminophen Monograph, 53 Fed. Reg. at 46,256-57.  The Tylenol label also warns that "acetaminophen may cause severe skin reactions" such as a "rash."  This warning is not mentioned anywhere in the monograph either, though FDA has *encouraged* marketers to voluntarily add this warning.[19]  In short, if the "exact language" rule somehow limited marketers to warnings contained in regulations or the applicable monograph, the Tylenol label would be—and has long been—in violation of the law.  *See* Defs.Br.54.

In response, Defendants offer a "pregnancy is special" rule of law, suggesting that the exact-language rule makes the general pregnancy warning both a floor and a ceiling on the subject of pregnancies, while marketers are free to add additional warnings on other conditions.  *See, e.g.*, Defs.Br.54.  This argument of convenience ignores that the clear terms of § 330.1(c)(2) apply to the entire Acetaminophen Monograph *and* applicable regulations.  *See* 21 C.F.R. § 330.1(c)(2) (requiring exact language when established "by quotation marks *in an applicable OTC drug monograph or by regulation (e.g., § 201.63 of this chapter)*" (emphasis added)).  Either this regulation makes the entire Acetaminophen Monograph and the general

---

[19]  FDA, *Guidance for Industry: Recommended Warning for Over-the-Counter Acetaminophen-Containing Drug Products and Labeling Statements Regarding Serious Skin Reactions* (Jan. 2017), *available at* https://www.fda.gov/media/90572/download.

pregnancy warning exclusive or it does not; there is no special carveout for a certain type of warning.

Thwarted by the text, Defendants point to regulatory history. Defs.Br.54. But the cited informal FDA statements about exclusivity describe an *old* regulatory regime—before § 330.1(c)(2) had even been proposed—and necessarily lack any consideration of the yet-to-be-written rule. *See* Labeling of Drug Products for Over-the-Counter Human Use, 50 Fed. Reg. 15,810, 15,810 (Apr. 22, 1985) ("proposing to change [FDA's] exclusivity policy" by promulgating § 330.1(c)(2)); A-967 (The District Court stating that Defendants' same argument "misconstrues both the text of the Exact Language Regulation and the history behind its creation").

To the extent FDA's informal statements are relevant, Defendants ignore FDA's other statements that reinforce the plain meaning of § 330.1(c)(2). As the District Court recognized, FDA later finalized § 201.66 and OTC drug labeling requirements and changed its view on where the additional warnings should appear. *See* A-590-91; A-954-55. In response to comments where "several manufacturers requested that FDA allow voluntary warnings to appear under the appropriate headings to further protect consumers from possible misuse of the product," FDA encouraged "manufacturers to discuss with the agency the addition of **voluntary warnings** to OTC drug products." Over-The-Counter Human Drugs; Labeling

28

Requirements, 64 Fed. Reg. 13,254, 13,271 (Mar. 17, 1999) (emphasis added); *see* A-590-91 (same); A-954-55, A-967.

### C. FDA Did Not Interpret § 201.63 To Forbid Additional Pregnancy Warnings, And *Auer* Deference Does Not Apply.

Defendants urge the Court to defer to FDA's interpretation of 21 C.F.R. § 201.63 as "exclusive and preemptive," but FDA did not interpret the text. FDA rather said, in 1982, that "differing State OTC drug pregnancy-nursing warning requirements would prevent accomplishment of the *full purpose and objectives* of the agency in issuing the regulation." Pregnant or Nursing Women; Delegations of Authority and Organization; Amendment of Labeling Requirements for Over-the-County Human Drugs, 47 Fed. Reg. 54,750, 54,756 (Dec. 3, 1982) (emphasis added). That out-of-date commentary is about objects-and-purposes preemption, not impossibility, which is all Defendants argued below. It does not purport to interpret a single ambiguous word of the general pregnancy warning. *See Kisor v. Wilkie*, 588 U.S. 558, 563 (2019) (stating that *Auer* deference is about deferring to "agencies' reasonable readings of [their own] genuinely ambiguous regulations"); *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (an agency's comments "cannot be considered an interpretation of the regulation" unless the agency is interpreting "the meaning of the regulation"). FDA's commentary was also focused on "whether States can

29

modify the Pregnancy Warning or replace it with their own version," not whether an additional warning could be added.  MDL Dkt.601 at 4.

Defendants also never engage with the rigorous steps *Kisor* insists upon before yielding to an agency's view.  Defendants have not shown that (1) § 201.63 is ambiguous; (2) it would be reasonable to read into § 201.63 a different (and unwritten) command; (3) FDA's desire to preempt the laws of sovereign states somehow falls within its substantive expertise, *see Wyeth*, 555 U.S. at 576-77 ("[A]gencies have no special authority to pronounce on pre-emption" and thus courts have "not deferred to an agency's *conclusion* that state law is pre-empted."); and (4) FDA's 1982 interpretation was "consistent" with later statements (it was not) and "contemporaneous" with a regulation promulgated in 1999 (it was not).  *Kisor*, 588 U.S. at 563 (holding that these elements are required for deference).

### D. Policy Concerns Are Irrelevant And Weigh Against Preemption.

The Supremacy Clause requires state law to yield to the "supreme law of the land."  U.S. Const. art. VI, cl. 2.  It does not cast aside the law of co-equal sovereigns because self-interested industry groups opine that state law is a really bad idea.  That can be the beginning and the end of the policy-based analysis.

Regardless, any policy considerations cut against preemption.  State law "failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not FDA, bear primary responsibility for their drug labeling at all

30

times." *Wyeth*, 555 U.S. at 579. That is why FDA has "traditionally regarded state law as a complementary form of drug regulation." *Id.* at 578; A-603. For APAP itself, there are at least two instances where risks were identified (liver failure and skin rash) that do not appear in the federal monograph. State law supplied the needed incentive for manufacturers to warn consumers of these risks.

Moreover, concerns regarding overuse or inconsistent warnings have not come to fruition despite the ability of manufacturers and marketers to add voluntary warnings. The size of the Tylenol warning label remains manageable. And, whatever the definition of "over-warning" is, it surely does not include safeguarding the health of children.

## CONCLUSION

The judgment of the District Court should be reversed. In the alternative, the judgement of the District Court should be vacated and the case remanded so the District Court can properly apply Rule 702(d).

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,000 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft 365 Word in Times New Roman 14-pt font.

Dated this 27th day of November, 2024.

*/s/ Ashley Keller*
Ashley Keller
KELLER POSTMAN LLC
*Attorneys for Plaintiffs–Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 27, 2024, an electronic copy of the foregoing Reply Brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

*/s/ Ashley Keller*
Ashley Keller
KELLER POSTMAN LLC
*Attorneys for Plaintiffs–Appellants*