# 24-916(L)

## 24-2360(CON), 24-1121(CON), 24-2594

United States Court of Appeals
*for the*
Second Circuit

TIFFANY RUTLEDGE, individually and as a mother, general guardian of, *et. al.*, KRISTOPHER WHITE, BRIDGET MCCONNELL, ALEXANDER HOLLAND, CHRISTINE HOLLAND,

*Plaintiffs-Appellants,*

– v.–

WALGREEN CO., COSTCO WHOLESALE CORPORATION, CVS HEALTH CORPORATION, CVS PHARMACY, INC., SAFEWAY, INC., WALMART INC., a Delaware Corporation, RITE AID CORPORATION, FAMILY DOLLAR, INC., TARGET CORPORATION, SAM'S WEST, INC., DOLLAR TREE, INC., 7-ELEVEN, INC., FAMILY DOLLAR STORES, INC., THE KROGER CO., DOLLAR TREE STORES, INC., JOHNSON & JOHNSON CONSUMER INC., BIG LOTS, GIANT FOOD LLC, ALBERTSON'S, HARRIS TEETER LLC, DOLGENCORP, LLC,

*Defendants-Appellees.*

*(For Continuation of Caption See Inside Cover)*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES' PETITION FOR REHEARING AND/OR REHEARING *EN BANC***

*Counsel for Amicus Curiae:*

Michael X. Imbroscio
Megan Mers
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

---

MICHELLE PHIPPEN, individually and as General Guardian of P.P. and L. A., minors, ALISHA DAY, individually and as mother, General Guardian of A.D., a minor, SARAH STOKES, individually and as General Guardian of K.G., a minor, JUAN EMANUEL BORDOY, individually, MARY ELIN ARCE, individually and as Mother of JUAN EMANUEL BORDOY, AMANDA TRIGLOFF, individually and as General Guardian of R.S., a minor, DEANDRE BARBEE, individually, JANTAIL BARBEE, individually and as Mother of DEANDRE BARBEE, LAURIE COURINGTON, HUNTER COURINGTON, JENNIFER MORROW, ALENA MORROW, CALLISTA BASSETT, ANDREW BASSETT, SONNITA ROBY, individually and as General Guardian of D.P., a minor, SHANNON MIKUSKI, BRAYDON MCKENZIE, HEATHER GILLIAM, COLBY GILLIAM, TAYLOR BROWN, TARYNE BURKE, individually and as Mother with Court Appointed Guardian of ASHTON BURKE, SAMARI SIMS, individually, DENISA CULLOM, individually and as Mother of SAMARI SIMS, COLLIN STOVER, individually, DANA STEWART, individually and as Mother of COLLIN STOVER, RIAN CZAR JOHNSON, individually, SHILO RICH, individually and as Mother of RIAN CZAR JOHNSON, SHEENA SCHNEPP, individually and as Mother and Natural Guardian of H.S., a minor, ZAYNE COSTELLO, individually, CRYSTAL ALEXANDER, COURTNEY TILLOTSON, MICHELLE BROWN,

*Plaintiffs-Appellants,*

– v. –

WALGREEN CO., JOHNSON & JOHNSON CONSUMER INC., WALMART INC.,

*Defendants-Appellees.*

---

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the Pharmaceutical Research and Manufacturers of America states that it has no parent corporation, and no corporation or publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ................................................................................ 1

ARGUMENT......................................................................................... 3

I. The Panel's Decision Would Allow Scientific Guesswork to Reach the Jury, with Profound Public Health Implications. ................................................................ 3

A. Scientific Consensus Does Not Support a Causal Link Between Prenatal Acetaminophen Use and Neurodevelopmental Disorders ..................................... 4

B. The Panel's Conclusion that the Jury Should Assess the Reliability of the Experts' Opinions Cannot be Squared with Amended Rule 702 and Longstanding Circuit Precedent ..................................... 6

C. Permitting Litigation to Outpace Scientific Understanding Threatens Public Health and Innovation ................................................................... 7

II. The Panel's Evaluation of the Trial Court's Gatekeeping Analysis Does Not Comport with "Abuse of Discretion" Review ........................................................................ 10

CONCLUSION .................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prods. Liab.*,
511 F. Supp. 2d 1288 (M.D. Fla. 2007) ... 3

*In re Acetaminophen—ASD-ADHD Prods. Liab. Litig.*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023) ... 5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ... 9, 10, 11, 12

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ... 4

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ... 2

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136, 143 (1997) ... 10

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
No. 14-MD-2542 (VSB) (S.D.N.Y. Jan. 30, 2025) ... 12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ... 10

*In re Mirena IUD Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ... 3, 7

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
982 F.3d 113 (2d Cir. 2020) ... 3, 4, 7

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ... 1

*Torcivia v. Suffolk County*,
17 F.4th 342 (2d Cir. 2021) ... 11

*United States v. Jones*,
965 F.3d 149 (2d Cir. 2020) .......................................................... 10

*United States v. Walker*,
No. 18-3506, 2023 WL 3451419 (2d Cir. May 15, 2023) ................................ 11

**Statutes**

Fed. R. Evid. 702 .......................................................................... *passim*

**Other Authorities**

*Acetaminophen*, U.S. Food & Drug Admin.,
https://www.fda.gov/drugs/safe-use-over-counter-pain-relievers-and-fever-reducers/acetaminophen ........................................ 4

Am. Coll. of Obstetricians & Gynecologists, ACOG Response to Consensus Statement on Paracetamol Use During Pregnancy *(Sept. 29, 2021),* https://www.acog.org/news-articles/news-articles/2021/09/response-to-consensus-statement-on-paracetamol-use-during-pregnancy .......................................... 5

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision, 2022) ............................ 4

Jocelyn Ulrich, *ICYMI: Biopharmaceutical Companies in America Hit New Investment Milestone, PhRMA* (August 14, 2026), https://phrma.org/blog/icymi-biopharmaceutical-companies-in-america-hit-new-investment-milestone ..................................... 3

*Pfizer Paid $896 Million in Prempro Accords, Filing Shows*, Bloomberg (June 19, 2012), https://www.bloomberg.com/news/articles/2012-06-19/pfizer-paid-896-million-in-prempro-accords-filing-shows-1- ............................ 8

Press Release, U.S. Food & Drug Admin., *FDA Approves Diclegis for Pregnant Women Experiencing Nausea and Vomiting* (Apr. 8, 2013), https://wayback.archive-it.org/7993/20170112223043/http://www.fda.gov/News Events/Newsroom/PressAnnouncements/ucm347087.htm ..................... 8

Press Release, U.S. Food & Drug Admin., *HHS Advances Women's Health, Removes Misleading FDA Warnings on Hormone Replacement Therapy* (Nov. 10, 2025), https://www.fda.gov/news-events/press-announcements/hhs-advances-womens-health-removes-misleading-fda-warnings-hormone-replacement-therapy .....................9

Zeev Shoham, Ariel Weissman & Eli Y. Adashi, *Twenty-Three Years from Error to Correction: The Hormone Therapy Catastrophe and the Urgent Case for Regulatory Reform* ...........................................................9

## INTRODUCTION[1]

Under Rule 702, the district court must make a factual assessment as to the reliability of the methodology underlying proffered scientific opinions before they can be presented to a jury. Those reliability determinations are owed significant deference. The panel's decision oversteps the bounds of permissible appellate review, falling far out of step with this Court's precedents and fundamentally undermining the function of judicial gatekeeping recently reaffirmed by the Rules Committee. In disrupting Rule 702's careful balance between science and law that promotes patient health, innovation, and the integrity of courtroom fact-finding, the panel's decision will yield significant confusion if left intact.

*First,* despite extensive research into the potential causes of autism spectrum disorder ("ASD") and attention deficit disorder ("ADHD"), no major regulatory body or medical organization, let alone the scientific community more broadly, has concluded that prenatal acetaminophen use causes either disorder. Novel driving causes of these disorders will not be unearthed as part of civil tort litigation. The courtroom is not a laboratory, and Rule 702 exists to ensure that a jury is not asked to speculate about scientific questions. What Judge Posner wrote thirty years ago

[1] No party, party's counsel, or person other than *amicus* authored this brief—in whole or in part—or contributed money for the preparation or submission of this brief. A list of PhRMA members is available at http://www.phrma.org/about#members.

remains true today: "The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

*Second,* as the Rules Committee recently reemphasized, Rule 702 places the onus on district courts to stand as bulwarks against unreliable scientific evidence, a duty which the district court here fulfilled with impeccable fidelity. Just as the trial court "'cannot abdicate its role as gatekeeper,' nor 'delegat[e] that role to the jury,'" *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) (citation omitted) (alterations in original), the appellate court cannot interpose what it thinks the science might show. The district court's meticulous examination of Plaintiffs' experts' methodology cannot feasibly constitute an abuse of the wide discretion afforded district courts under Rule 702.

The panel's decision reflects a fundamental misapplication of an appellate court's role in reviewing a district court's Rule 702 decision—one that will have profound implications for women's health. The panel's decision is one of the rare cases that warrant this Court's full review.

## STATEMENT OF INTEREST

The Pharmaceutical Research and Manufacturers of America ("PhRMA") is a voluntary nonprofit association representing the country's leading innovative biopharmaceutical research companies, which are focused on developing innovative

medicines that transform lives and create a healthier world. PhRMA member companies have invested over $900 billion in the search for new treatments and cures over the last decade, supporting nearly five million jobs in the United States. *See* Jocelyn Ulrich, *ICYMI: Biopharmaceutical Companies in America Hit New Investment Milestone, PhRMA* (August 14, 2026), https://phrma.org/blog/icymi-biopharmaceutical-companies-in-america-hit-new-investment-milestone [https://perma.cc/2S2H-6WXJ].

PhRMA has a vital institutional interest in ensuring lay juries only hear reliable causation testimony: relaxing admissibility standards for scientific evidence exposes PhRMA's members to liability untethered from sound science. That exposure, in turn, impedes innovation and the delivery of new medicines to patients and can have broader public health implications. PhRMA respectfully files this brief as amicus curiae to urge the Court to grant rehearing.

## ARGUMENT

### I. The Panel's Decision Would Allow Scientific Guesswork to Reach the Jury, with Profound Public Health Implications.

It is not the role of litigation to draw conclusions that science has not reached outside the courtroom—the court's task is not to solve medical mysteries, but rather to prevent legal factfinding from outpacing reliable science. *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 298 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods.*

*Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (excluding expert testimony that is "plausible," but "not proven"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596–97 (1993) ("[T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory .... The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses .... Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past.").

### A. Scientific Consensus Does Not Support a Causal Link Between Prenatal Acetaminophen Use and Neurodevelopmental Disorders

One immutable fact pervades this litigation: the theory of Plaintiffs' experts that acetaminophen causes ADHD/ASD cannot be squared with the current body of scientific evidence. The panel acknowledges the four decades of research demonstrating the central role that genetics play in the development of these disorders. Panel Op. at 9–10; *see also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision, 2022) at 64 (ASD), 71 (ADHD). No major regulator or medical organization has concluded that prenatal acetaminophen use causes ASD or ADHD. Since it began monitoring the issue in 2014, the FDA has consistently found the evidence "unable to support a determination of causality." See *Acetaminophen*, U.S. Food & Drug Admin.,

https://www.fda.gov/drugs/safe-use-over-counter-pain-relievers-and-fever-reducers/acetaminophen [https://perma.cc/X8ST-2PH3].

The American College of Obstetricians and Gynecologists and the European Network of Teratology Information Services ("ENTIS") have reached similar conclusions, with ENTIS cautioning unfounded claims of causation "promote unwarranted uncertainty, fear, and guilt among pregnant women" and "likely result in use of less safe alternatives during pregnancy." *See In re Acetaminophen—ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 332–33 (S.D.N.Y. 2023) (quoting ENTIS Position Statement); Am. Coll. of Obstetricians & Gynecologists, ACOG Response to Consensus Statement on Paracetamol Use During Pregnancy *(Sept. 29, 2021),* https://www.acog.org/news-articles/news-articles/2021/09/response-to-consensus-statement-on-paracetamol-use-during-pregnancy [https://perma.cc/2KHL-53AK].

This Court has confirmed that a trial court is "well within its discretion to consider whether plaintiffs' experts' conclusions [are] generally accepted by the scientific community." *In re Mirena (No. II)*, 982 F.3d at 124. But the panel here turned *Daubert*'s general acceptance prong on its head, concluding that the district court abused its discretion in part because causation is "reasonably subject to debate." Panel Op. at 50. If the standard articulated by the panel—whether "scientists may, and in fact do, disagree on the ultimate answer to the … question"

(Panel Op. at 7)—were to be accepted, claims could proceed to a jury upon a showing of *any* purported scientific disagreement, no matter how out of line with the scientific consensus. Setting such a low bar for admission would run afoul of the clear intent of the Rule 702 amendments while allowing a tiny faction of dissenters to chill innovation and the development of life-saving treatments in pursuit of an extreme agenda. Recognizing this concern, trial court properly questioned the reliability of experts who claim to have applied "methodologies generally accepted in their field," *id.*, yet nonetheless reached causal conclusions rejected by every major scientific body and federal agency. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Under the amendment, … when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied.").

### B. <u>The Panel's Conclusion that the Jury Should Assess the Reliability of the Experts' Opinions Cannot be Squared with Amended Rule 702 and Longstanding Circuit Precedent</u>

The 2023 amendments to Rule 702 made clear what was already long-established in this Circuit: reliability is not a question of weight, and the trial court bears the responsibility of safeguarding judicial factfinding. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) ("[W]e must resist 'the

temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves.'") (internal citations omitted). Where an expert goes out on a limb to contradict widespread scientific knowledge, the jury should not be put in the role to "guess as to the validity of a novel and untested theory." *In re Mirena (No. II)*, 341 F. Supp. 3d at 270.

Despite the panel's claim to the contrary, *see* Panel Op. at 33, n. 15, the trial court's ability to sift through misleading expert analyses is precisely *why* it plays the crucial role of gatekeeper. The Rules Committee contemplated this very question when implementing Rule 702 and its amendments: just because a seasoned trial judge can ferret out flaws in an expert's methodology does not mean that a lay jury can—or should be asked to do so. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[J]urors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion[s]."). The panel's conclusion that the jury should be left to sort all this out runs afoul of this paradigm.

C. Permitting Litigation to Outpace Scientific Understanding Threatens Public Health and Innovation

The panel's decision will have a profound implication on women's health. Currently, pregnant women turn to acetaminophen to safely treat illness and fever, which if left untreated, can damage the health of the growing fetus. Eschewing juridical gatekeeping and leaving it to juries to decide the scientific question risks

undermining doctors' and expectant mothers' justified confidence in this important medicine.

History teaches us the consequences. In the 1980s, Bendectin—then the only FDA-approved treatment for nausea during pregnancy—was named as the cause of birth defects in thousands of lawsuits. *See* Slaughter et al., *FDA Approval of Doxylamine–Pyridoxine Therapy for Use in Pregnancy*, 370 New Eng. J. Med. 1081, 1081 (2014). Scientifically baseless claims drove Bendectin off the market in 1983, resulting in a thirty-year period during which American women had no FDA-approved option for pregnancy nausea. *Id.* This gap persisted until 2013, when the FDA approved the same medicine under a new name, demonstrating it had been safe all along. *See* Press Release, U.S. Food & Drug Admin., *FDA Approves Diclegis for Pregnant Women Experiencing Nausea and Vomiting* (Apr. 8, 2013), https://wayback.archive-it.org/7993/20170112223043/http://www.fda.gov/News Events/Newsroom/PressAnnouncements/ucm347087.htm.

Litigation surrounding hormone replacement therapy ("HRT") similarly adversely impacted women's health. In the early 2000s, thousands of lawsuits sprung from a flawed report about HRT's alleged relationship to breast cancer. *See* Jef Feeley, *Pfizer Paid $896 Million in Prempro Accords, Filing Shows*, Bloomberg (June 19, 2012), https://www.bloomberg.com/news/articles/2012-06-19/pfizer-paid-896-million-in-prempro-accords-filing-shows-1- [https://perma.cc/G7GU-

9SEJ]. Many courts allowed juries to sort out the causation question, leading to hundreds of millions of dollars in verdicts. *Id.* Litigation supercharged public concerns that left a generation of women to suffer debilitating menopause symptoms, deprived of a beneficial therapy based on scientifically unsubstantiated theories: "Physicians prescribing HRT to a woman who subsequently developed breast cancer faced potential litigation; physicians declining to prescribe therapy to women who subsequently suffered cardiovascular disease or fractures faced no comparable liability. The asymmetric legal risk created a powerful incentive structure that favored non-treatment, regardless of net benefit." Zeev Shoham, Ariel Weissman & Eli Y. Adashi, *Twenty-Three Years from Error to Correction: The Hormone Therapy Catastrophe and the Urgent Case for Regulatory Reform*, 4 J. IVF-Worldwide 15 (2026); *see also* Press Release, U.S. Food & Drug Admin., *HHS Advances Women's Health, Removes Misleading FDA Warnings on Hormone Replacement Therapy* (Nov. 10, 2025), https://www.fda.gov/news-events/press-announcements/hhs-advances-womens-health-removes-misleading-fda-warnings-hormone-replacement-therapy [https://perma.cc/3N5G-7EFW].

Weakening trial courts' ability to filter out unreliable science opens the door to speculative litigation and risks triggering this same cycle of unwarranted harm. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (Rule 702 "gives the district court the discretion needed to ensure that the courtroom door

remains closed to junk science"). The bedrock principle that law must lag science does not limit access to justice, but instead ensures that binding legal outcomes with profound consequences beyond the courtroom are grounded in reliable scientific knowledge, not conjecture.

## II. The Panel's Evaluation of the Trial Court's Gatekeeping Analysis Does Not Comport with "Abuse of Discretion" Review

Given the importance of keeping the courtroom in line with scientific realities, Rule 702 affords the trial court substantial discretion to determine the reliability of an expert's methodology. Due to the trial judge's superior knowledge of underlying facts, studies, and stated opinions, Rule 702 demands that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). As the Second Circuit recognizes, a trial court's discretion includes the "discretion in deciding *how* to determine reliability." *Amorgianos*, 303 F.3d at 270.

Deference is the "hallmark" of abuse-of-discretion review. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). Under well-established Circuit precedent, an appellate court must not conduct a *de novo* reweighing of the scientific record but instead must affirm the trial court's ruling absent some showing that it is "manifestly erroneous." *Amorgianos*, 303 F.3d at 265. In other words, the trial court's ruling should be upheld unless the appellate court determines "the trial judge ruled in an

arbitrary and irrational fashion." *Torcivia v. Suffolk County*, 17 F.4th 342, 365 (2d Cir. 2021) (internal citation omitted); *see also United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *2 (2d Cir. May 15, 2023) (no abuse of discretion where trial court took a "thoughtful and careful approach to evaluating the basis for [expert] testimony").

The panel openly acknowledged Judge Cote's "reasoning was considered and extensive"—the opposite of "arbitrary and irrational." Panel Op. at 50. The panel also credited the trial court's reliability concerns as "legitimate," *id.* at 40, even characterizing them as reasonable, *id.* at 43 (acknowledging "the district court's questioning of [the expert's] logic" was not "unreasonable").

Rather than deem the trial court's opinion arbitrary or irrational, the panel simply disagreed with some of its substantive conclusions regarding the methodologies of Plaintiffs' experts. *See, e.g., id.* at 39 ("[A]lthough the width of a confidence interval is relevant … that does not warrant the wholesale rejection of [a study]."); 43 (disagreeing with exclusion because the expert's "point is not unreasonable"). The panel repeatedly pointed to the existence of *any* methodological precedent as sufficient for admission, *see, e.g., id.* at 31–33, 51, 54; however, this Circuit's precedent establishes that even where an expert utilizes scientific methods, the court may nevertheless exclude an opinion that fails to "apply [that] methodology reliably[,]" whether due to assumptions, data, or studies "that are simply inadequate

to support the conclusions reached." *Amorgianos*, 303 F.3d at 266–68; *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB) at *16 (S.D.N.Y. Jan. 30, 2025) (excluding unreliable testimony despite "a potentially viable methodology"). And the ultimate operative question is not whether the appellate court would have credited different studies, assigned a certain factor greater weight, or accepted an extrapolation that Judge Cote rejected—instead, it is whether the trial court's findings were so arbitrary as to justify substitution of the appellate panel's reliability judgments instead. The panel's repeated (and accurate) characterization of the trial court's analysis as reasonable, extensive, considered, and legitimate simply cannot support such a finding here.

## CONCLUSION

For these reasons, PhRMA supports Defendants' request for rehearing, or, at minimum, for confirmation of Judge Cote's discretion to re-examine admissibility using the updated complete body of evidence.

September 17, 2026

Respectfully submitted,

*/s/ Michael X. Imbroscio*
Michael X. Imbroscio
Megan Mers
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

In compliance with Federal Rules of Appellate Procedure 29(a)(4)(G), 29(a)(5), 32(a)(5)(A), and Circuit Rules 29.1(c) and 32.1(a)(4)(A), this amicus brief uses a proportionally spaced typeface, 14-point Times New Roman font, and contains 2,588 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned relied on the word count feature of Microsoft Word in preparing this certificate.

September 17, 2026

*/s/ Michael X. Imbroscio*
Michael X. Imbroscio

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2026, the attached brief was served on all parties or their counsel of record through the Court's CM/ECF system.

September 17, 2026

*/s/ Michael X. Imbroscio*
Michael X. Imbroscio